# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) ROBBIE EMERY BURKE, ,<br>as the Special Administratrix of the Estate of<br>Elliott Earl Williams, Deceased,<br><br>        Plaintiff,<br><br>v.<br><br>(1) STANLEY GLANZ, SHERIFF OF TULSA<br>    COUNTY, in His Individual and Official<br>    Capacities;<br>(2) CORRECTIONAL HEALTHCARE<br>    MANAGEMENT OF OKLAHOMA, INC.;<br>(3) CORRECTIONAL HEALTHCARE<br>    COMPANIES, Inc.;<br>(4) CORRECTIONAL HEALTHCARE<br>    MANAGEMENT, INC.,<br>(5) EARNIE CHAPPELL, R.N.;<br>(6) CARMEN LUCA, LPN;<br>(7) JULIE HIGHTOWER;<br>(8) TRACY TOWNSEND;<br>(9) JACK WELLS;<br>(10) H.D. PITT;<br>(11) LEM MUTII; and<br>(12) DOES I through X,<br><br>        Defendants. | Case No. 11-CV-720-JHP-TLW<br><br>JURY TRIAL DEMANDED<br><br>ATTORNEY LIEN CLAIMED |

## SECOND AMENDED COMPLAINT

**COMES NOW** the Plaintiff, Robbie Emery Burke, as the Special Administratrix of the

Estate of Elliott Earl Williams, deceased, and pursuant to Rule 15(a)(2) of the Federal Rules of

Civil Procedure, upon the written consent of the opposing parties, files this Second Amended

Complaint, and for her causes of action against the Defendants, alleges and states a follows:

## INTRODUCTORY STATEMENT

1.    On October 27, 2011, Elliott Williams ("Mr. Williams") was found dead in his jail cell at the David L. Moss Criminal Justice Center (hereinafter "Tulsa County Jail").  He was just thirty-seven (37) years old.

2.    Mr. Williams was arrested by Owasso Police Department ("OPD") officers on October 21, 2011.  At the time of his arrest, Mr. Williams was obviously and substantially at risk of harming himself.  As documented in the police report, it was "readily apparent" that Mr. Williams was having a "mental breakdown."  At one point during his encounter with OPD, Mr. Williams stated that he was going to kill himself that night and asked police to "shoot me twice." At another point, Mr. Williams inquired of the officers, "What do I have to do to get you to shoot me?"

3.    Mr. Williams was initially taken to OPD headquarters for booking on a misdemeanor obstruction charge.  While at the OPD headquarters, Mr. Williams continued to behave strangely and erratically, displaying signs of severe and acute psychosis and suicidal tendencies.  It was obvious that Mr. Williams posed a substantial threat to himself and was in need of immediate mental health treatment.  However, rather than providing Mr. Williams with the urgently needed mental health care or transporting him to a mental health facility, OPD placed Mr. Williams in a video-monitored holding cell.  While in the holding cell, Mr. Williams was observed crawling on his hands and knees, barking and screaming, and repeatedly slamming his head against the cell door and walls with great force.

4.    After observing Mr. Williams in the holding cell, despite his continuing and obvious need for immediate medical attention, the OPD failed to transport Mr. Williams to a hospital for mental health treatment and/or assessment of any head or neck injuries caused by his

self-injurious behavior.  Instead, on October 22, 2011, OPD transported Mr. Williams to the Tulsa County Jail, where he died five days later.

5.    Tulsa County Jail personnel and employees and/or agents of Defendants, Correctional Healthcare Management of Oklahoma, Inc. ("CHMO"), Correctional Healthcare Companies, Inc. ("CHC") and Correctional Healthcare Management, Inc. ("CHM"), were clearly on notice of Mr. Williams' acute suicidal tendencies, serious mental health issues and possible head and/or neck injuries.  However, the Tulsa County Jail personnel and CHMO/CHC/CHM disregarded the known, obvious and excessive risks to Mr. Williams' health and safety.  Mr. Williams was not given timely mental health or medical treatment, despite the obvious and emergent need.  Mr. Williams was not transported to a mental health facility or hospital and did not receive an MRI or CT scan for assessment and evaluation of any head or neck injuries.  Mr. Williams was not properly segregated from other prisoners, despite his obvious and serious mental illness.  Mr. Williams was not properly monitored and did not receive even the most basic and necessary medical assessments and treatment.  Simply put, Mr. Williams sat in a cell dying for five days without *ever* receiving the treatment and care he so desperately and obviously needed.

6.    Consistent with established policies, practices and/or customs, Defendants failed to provide Mr. Williams with adequate and timely medical or psychiatric care and failed to take other measures to protect him from physical harm, in deliberate indifference to his  health and safety.

## JURISDICTION AND VENUE

7.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and

Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

8.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

10.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

11.     Plaintiff, Robbie Emery Burke ("Plaintiff"), is a resident of Tulsa County, Oklahoma, and the duly-appointed Special Administratrix of the Estate of Mr. Williams. The survival causes of action in this matter are based on violations of Mr. Williams' rights under the Eighth and/or Fourteenth Amendments and Oklahoma State Law.

12.     Defendant, Stanley Glanz ("Sheriff Glanz" or "Defendant Glanz"), is, and was at all times relevant hereto, the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma. Defendant Glanz, as Sheriff and the head of the Tulsa County Sheriff's Department, was, at all times relevant hereto, responsible for ensuring the safety and well-being of inmates detained and housed at the Tulsa County Jail, including the provision of appropriate medical care and treatment to inmates in need of such care, pursuant to 57 O.S. § 47. In addition, Defendant Glanz is, and was at all times pertinent hereto, responsible for creating, adopting, approving,

ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the Tulsa County Sheriff's Department and Tulsa County Jail, including the policies, practices, procedures, and/or customs that violated Mr. Williams' rights as set forth in this Amended Complaint.  Defendant Glanz is sued in his individual and official capacities.

13.    Defendant, Correctional Healthcare Management of Oklahoma, Inc. ("CHMO"), was, at all times relevant hereto, a foreign corporation doing business in Tulsa County, Oklahoma.  CHMO was, at all times relevant hereto, responsible, in part, for providing medical services and medication to Mr. Williams while he was in the custody of the Sheriff's Department.  CHMO was additionally responsible, in part, for implementing Tulsa County Jail policies regarding medical and mental health care, assisting in developing those policies and in training and supervising its employees.

14.    Defendant, Correctional Healthcare Companies, Inc. ("CHC"), is a foreign corporation which, during all relevant time periods, did business within Tulsa County, Oklahoma.  During all relevant time periods, CHC had an employer-employee relationship with medical personnel, including nurses, providing medical and mental health care services at the Tulsa County Jail.  During all relevant time periods, CHC controlled the operations of Defendant Correctional Healthcare Management, Inc. and CHMO, and/or served as their alter ego.

15.    Defendant, Correctional Healthcare Management, Inc. ("CHM"), is a foreign corporation which, during all relevant time periods, did business within Tulsa County, Oklahoma.  During all relevant time periods, CHM controlled, directed and oversaw CHMO with respect to mental health care services provided at the Tulsa County Jail, and/or served as CHMO's alter ego.  CHM was additionally responsible, in part, for developing Tulsa County Jail

policies regarding mental health care and for training and supervising its CHMO/CHC employees with respect to mental health care.

16.    Defendant, Earnie Chappell, RN ("Nurse Chappell" or "Defendant Chappell"), was, at all times relevant hereto, an employee and/or agent of CHMO/CHC/CHM, who was, in part, responsible for overseeing Mr. Williams' health and well-being, and assuring that Mr. Williams' medical and mental health needs were met, during the time he was in the custody of the Sheriff's Department.  Nurse Chappell is being sued in her individual capacity.

17.    Defendant, Carmen Luca, LPN ("Nurse Luca" or "Defendant Luca"), was, at all times relevant hereto, an employee and/or agent of CHMO/CHC/CHM, who was, in part, responsible for overseeing Mr. Williams' health and well-being, and assuring that Mr. Williams' medical and mental health needs were met, during the time he was in the custody of the Sheriff's Department.  Nurse Luca is being sued in her individual capacity.

18.    Defendant, Julie Hightower ("Nurse Hightower" or "Defendant Hightower"), was, at all times relevant hereto, an employee and/or agent of CHMO/CHC/CHM, who was, in part, responsible for overseeing Mr. Williams' health and well-being, and assuring that Mr. Williams' medical and mental health needs were met, during the time he was in the custody of the Sheriff's Department.  Nurse Hightower is being sued in her individual capacity.

19.    Defendant, Captain Tracy Townsend ("Captain Townsend" or "Defendant Townsend"), was, at all times relevant hereto, acting under color of state law as an employee of the OPD, who was, in part, responsible for overseeing Mr. Williams' security, health and well-being, and assuring that Mr. Williams' medical and mental health needs were met, during the time he was in the custody of the OPD.  Captain Townsend is being sued in his individual capacity.

20.     Defendant, Officer Jack Wells ("Officer Wells" or "Defendant Wells"), was, at all times relevant hereto, acting under color of state law as an employee of the OPD, who was, in part, responsible for overseeing Mr. Williams' security, health and well-being, and assuring that Mr. Williams' medical and mental health needs were met, during the time he was in the custody of the OPD.  Officer Wells is being sued in his individual capacity.

21.     Defendant, Officer H.D. Pitt ("Officer Pitt" or "Defendant Pitt"), was, at all times relevant hereto, acting under color of state law as an employee of the OPD, who was, in part, responsible for overseeing Mr. Williams' security, health and well-being, and assuring that Mr. Williams' medical and mental health needs were met, during the time he was in the custody of the OPD.  Officer Pitt is being sued in his individual capacity.

22.     Defendant, Officer Lem Mutii ("Officer Mutii" or "Defendant Mutii"), was, at all times relevant hereto, acting under color of state law as an employee of the OPD, who was, in part, responsible for overseeing Williams' security, health and well-being, and assuring that Mr. Williams' medical and mental health needs were met, during the time he was in the custody of the OPD.  Officer Mutii is being sued in his individual capacity.

23.     The true names and identities of Defendants DOES I through X are presently unknown to Plaintiff.  Plaintiff alleges that each of Defendants DOES I through X was employed by the Tulsa County Sheriff's Department, CHMO/CHC/CHM and/or the OPD/City of Owasso. Plaintiff alleges that each of Defendants DOES I through X was deliberately indifferent to Mr. Williams' medical needs and safety, violated his civil rights, negligently and wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other Defendants to engage in such conduct.

## FACTUAL ALLEGATIONS

24.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 23, as though fully set forth herein.

25.     Defendants were aware of Mr. Williams' suicidal tendencies, serious psychological problems and potential head and neck injuries in advance of his untimely death on October 27, 2011.

26.     Mr. Williams was arrested in Owasso on October 21, 2011, after police responded to a disturbance at a local hotel.  When police arrived at the hotel, they found Mr. Williams in the lobby with his father.

27.     Officer Wells stated in his arrest report that "[i]t was readily apparent that [Mr. Williams] was having a mental breakdown" and that Williams "was rambling on about God, eating dirt."  As the police tried to speak with Mr. Williams, he exhibited unusual behavior, including exposing his chest and lying on the ground.

28.     The police report documents that Mr. Williams stated he was going to kill himself and asked police to "shoot me twice."  The report further provides that, at one point, Mr. Williams asked, "What do I have to do to get you to shoot me?"

29.     After the arrest, Mr. Williams was transported to OPD headquarters for "mandatory booking."

30.     Upon his arrival at OPD headquarters, Mr. Williams continued to exhibit strange and manic behavior consistent with acute and severe psychosis.

31.     While sitting in the OPD booking area, Mr. Williams swayed and hummed and ultimately fell to the ground, lying immobile.

32.      The "Intake Screening Form" completed by OPD indicates that when asked whether he was suicidal, Mr. Williams answered "yes."   In addition, the Arrest and Booking Report generated by OPD includes a "warning indicator" that Mr. Williams was "suicidal."

33.      Defendants Townsend, Wells, Pitt and Mutii (hereinafter collectively referred to as the "OPD Defendants") were all on duty at OPD headquarters at the time Mr. Williams was booked.

34.      Despite the known, obvious and excessive risk that Mr. Williams would harm himself, rather than transporting him to a facility for mental health treatment, the OPD Defendants locked Mr. Williams in a holding cell, pending transfer to the Tulsa County Jail.  The OPD Defendants did not put Mr. Williams on suicide watch or take other measures to ensure his safety and well-being.

35.      While Mr. Williams was in the OPD holding cell, he was monitored by video surveillance.  Thus, the OPD Defendants observed Mr. Williams' actions and behavior.

36.      During Mr. Williams' confinement in the OPD holding cell, he continued to exhibit behaviors that clearly and unambiguously showed he was suffering from severe and acute mental illness.  For instance, the surveillance video shows Mr. Williams screaming, dancing aimlessly, crawling on all fours and displaying other abnormal behaviors.

37.      Mr. Williams also physically injured and harmed himself while locked in the OPD holding cell.  Specifically, on several occasions, Mr. Williams slammed his head into the cell walls.  Also, while crawling on all fours and barking, Mr. Williams forcibly banged his head into and against the cell door.

38.      Despite the video evidence that Mr. Williams was suffering from obvious and serious mental illness, posed a substantial threat to himself and had physically injured his head

and/or neck, the OPD Defendants took no action to protect Mr. Williams from harm. In particular, they did not transport Mr. Williams to a hospital or mental health facility. In addition, the OPD Defendants failed to provide a CT scan, MRI, or any other diagnostic assessment or treatment related to the apparent head trauma.

39.     Instead, the OPD Defendants disregarded the known, obvious and excessive risks to Mr. Williams' health and safety, and transported him to the Tulsa County Jail on October 22, 2012.

40.     Upon his arrival at the Tulsa County Jail, Mr. Williams continued to behave in a manner evincing serious mental illness and the existence of emergent medical needs.

41.     On information and belief, while in the booking area of the Tulsa County Jail, Mr. Williams was screaming, saying that he could not walk, and pleading with Jail staff to "cut it out of my belly." Mr. Williams also exhibited posturing in his hands, which is consistent with a serious brain injury. On information and belief, Mr. Williams also either had a seizure or exhibited seizure-like movements while in the booking area. Furthermore, on information and belief, Mr. Williams may have hit his head on the floor while in the booking area.

42.     On information and belief, Mr. Williams informed the booking nurse employed by CHMO/CHC/CHM that he had rammed his head into the OPD holding cell door and/or the booking nurse was otherwise informed that Mr. Williams had rammed his head into the OPD holding cell door. In addition, on information and belief, the Tulsa County Jail was put on notice that Mr. Williams was acutely suicidal and was suffering from a mental breakdown.

43.     Moreover, from his behavior and actions exhibited in the booking area of the Tulsa County Jail, it was obvious that Mr. Williams was suffering from serious mental and/or

neurological illness, posed a substantial threat to himself and/or had physically injured his head and/or neck.

44.     Nevertheless, despite Mr. Williams' obvious, serious and emergent medical and mental health needs, the Tulsa County Jail and CHMO/CHC/CHM personnel on duty in the booking area, including Defendant Chappell and Captain Tom Fike ("Captain Fike"), did not transport Mr. Williams to a hospital or mental health facility. In addition, the Tulsa County Jail and CHMO/CHC/CHM personnel on duty in the booking area, including Defendant Chappell and Captain Fike, failed to provide a CT scan, MRI, or any other diagnostic assessment or treatment related to the apparent head trauma.

45.     While a "medical emergency" was called in the booking area by responsible Tulsa County Jail and/or CHMO/CHC/CHM personnel, Mr. Williams was not provided with the assessment, evaluation or treatment he needed. Instead, Mr. Williams was hoisted onto a gurney lined with plastic trash bags. On information and belief, the gurney had inoperable restraints. Thus, Mr. Williams was not properly restrained. While on the gurney, Mr. Williams lost control of his bowel functions and defecated in his clothing. He continued to scream uncontrollably, continued to say that something needed to be cut out of him and exhibited other behaviors indicating that he had serious and emergent mental health and medical needs.

46.     On information and belief, Captain Fike determined that Mr. Williams should temporarily be placed in the "tank." The "tank" is a holding cell reserved for inmates who are loud or belligerent. Captain Fike did not assure that Mr. Williams received any medical or mental health treatment. Captain Fike ordered that Mr. Williams be taken from booking to the Jail's medical unit, but only so that Mr. Williams could be showered and cleaned up for lockup in the "tank."

47.     Mr. Williams was rolled down to the medical unit -- on the defective gurney -- for showering.  On his ride to the medical unit, Mr. Williams continued to exhibit bizarre behavior consistent with psychosis and/or a brain injury.  Defendant Chappell, who escorted Mr. Williams on his ride down to the medical unit, indicated that she thought Mr. Williams was faking injury. Defendant Chappell became agitated with Mr. Williams and said he was "full of shit."  At one point, Defendant Chappell expressed frustration with having to attend to Mr. Williams, stating that she had "too much stuff to do."

48.     Defendant Chappell made no attempt to secure any mental health or medical treatment for Mr. Williams.  Defendant Chappell failed to provide a CT scan, MRI, or any other diagnostic assessment or treatment related to the apparent head trauma.  Instead, Defendant Chappell disregarded the known, obvious and excessive risks to Mr. Williams' health and safety.

49.     After Mr. Williams had been in the shower for approximately 35 minutes, Captain Fike came down to the medical unit and ordered that Mr. Williams be placed in a cell.

50.     On information and belief, on either October 22 or 23, 2011, Mr. Williams was placed in a general population cell on the south side of the Jail.  Mr. Williams was not initially placed on suicide watch or in a suicide cell.  Mr. Williams was not properly assessed by a mental health professional or classified as mentally ill.  He was not properly segregated from other inmates.  Mr. Williams was not placed in a location where he could be closely and frequently monitored by staff until he could receive appropriate medical or mental health evaluation or treatment.  At no time was Mr. Williams transported to a hospital or mental health facility.  At no time was Mr. Williams provided a CT scan, MRI, or any other diagnostic assessment or treatment related to his apparent head trauma.

51.     On either October 24 or 25, 2011, Mr. Williams was examined by Dr. Stephen Harnish, a psychiatrist employed by CHMO/CHC/CHM.  On information and belief, after Mr. Williams was examined by Dr. Harnish, he was placed in a video monitored "suicide cell."

52.     Little is currently known about what occurred between the time Mr. Williams was placed in the suicide cell and his death.  On information and belief, Mr. Williams' vital signs were not taken at any time after he left booking.  On information and belief, at one point, a nurse employed by CHMO/CHC/CHM poured a liquid down Mr. Williams' throat even though he had no swallow reflex.

53.     On October 27, 2011, Defendants Luca and Hightower were on duty in the medical unit.  At the time, Defendant Luca had been a nurse at the Jail for approximately one week.  Defendant Luca was assigned to the north section of the medical unit, where Mr. Williams' suicide cell was, and Defendant Hightower was assigned to the south section of the medical unit.

54.     At some point on October 27, Mr. Williams collapsed in his cell, and there was a call of "man down."  On information and belief, Defendants Luca and Hightower entered Mr. Williams' cell.  However, on information and belief, Defendant Luca refused to get on the floor to administer CPR on Mr. Williams.  Defendant Luca indicated that she would only administer CPR while standing up.  Defendant Luca attempted to perform CPR on Mr. Williams while standing.  On information and belief, Defendant Luca, Defendant Hightower, or both, did not perform the adequate and proper number of chest compressions.

55.     On information and belief, neither Defendant Luca nor Defendant Hightower ever took Mr. Williams' vital signs at any time while he was in the medical unit.  On information and

belief, Defendant Luca, Defendant Hightower, or both, failed to adequately monitor and document Mr. Williams' condition while he was in the medical unit.

56.    Defendant Luca and Defendant Hightower failed to resuscitate Mr. Williams. He had died in the suicide cell at the age of thirty-seven (37).

57.    From the moment he presented at both the OPD headquarters and Tulsa County Jail, Mr. Williams posed an obvious, known and substantial risk of self-harm. At all relevant times, Mr. Williams had obvious, serious and emergent mental health needs. In addition, from the time that Mr. Williams slammed his head into the walls and door of the OPD holding cell, it was known and obvious that he needed an immediate CT scan, MRI, and/or other diagnostic assessment or treatment related to the apparent head trauma and/or neck injury. Defendants knew of and disregarded the excessive risks to Mr. Williams' health and safety. Defendants failed to provide Mr. Williams with adequate and timely medical and mental health care, protection or supervision in deliberate indifference to his health and safety. Defendants' deliberate indifference to the excessive risks to Mr. Williams's health and safety was a direct and proximate cause of his death.

58.    Defendants CHMO, CHC, CHM, Chappell, Luca and Hightower's (hereinafter, collectively referred to as "CHMO Defendants") and Captain Fike's deliberate indifference to Mr. Williams' serious medical needs was in furtherance of and consistent with: (a) policies which Sheriff Glanz promulgated, created, implemented or possessed responsibility for the continued operation of; (b) policies which CHMO/CHC/CHM had responsibility for implementing and which CHMO/CHC/CHM assisted in developing; and (c) established procedures, customs and/or patterns and practices.

59.     First, Defendants Glanz and CHMO/CHC/CHM failed to promulgate and implement, and knowingly failed to enforce, adequate mental health policies responsive to the serious medical needs of inmates like Mr. Williams.  In particular, during all times pertinent, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care specific to inmates' mental health needs.  It is common knowledge that mental illness is prevalent in our jails and prisons.  For instance, in 2006, the United States Bureau of Justice Statistics found that the rate of reported mental health disorders in the state prison population is five times greater (56.2%) than in the general adult population (11%).  It is vital that jails and prisons have policies in place establishing the standard of care for nurses and medical staff to follow in order to address this crisis.  On at least one previous occasion, Sheriff Glanz and CHMO/CHC/CHM were put on specific notice that their mental health policies and practices were inadequate to protect the safety of inmates with serious mental health needs.  In August of 2009, the Oklahoma Department of Health, in investigating the suicide of another inmate, found that the Tulsa County Jail was not in compliance with several provisions of the Oklahoma Jail Standards with respect to medical and mental health care.  The Oklahoma Department of Health determined that the Tulsa County Jail-CHMO/CHC/CHM personnel had failed to: (A) classify and segregate the inmate as mentally ill; (B) provide timely mental health evaluation and treatment for the inmate; and (C) place the inmate in an area for more frequent observations.  Despite these documented instances of noncompliance in 2009, the CHMO Defendants and Captain Fike repeated the same mistakes with respect to Mr. Williams, in deliberate indifference to known excessive risks to his health and safety.  And Sheriff Glanz failed to assure that the deficiencies identified by the Oklahoma Department of Health, in August 2009, were addressed and abated, such that additional violations would not occur.  The lack of guidance for personnel

to follow at the Tulsa County Jail as to the standard of care for inmates' mental health, and lack of enforcement of existing mental health policies or other guidelines, demonstrates a failure to train, failure to supervise and deliberate indifference to known, obvious and excessive risks to the health and safety of inmates like Mr. Williams.

60.     Second, Sheriff Glanz and CHMO/CHC/CHM have maintained a policy, practice and/or custom of providing untimely assessment, identification and treatment of inmates' medical and mental health needs, in disregard of known, obvious and excessive risks to the health and safety of inmates like Mr. Williams.  At all times pertinent, it was the policy of CHMO/CHC/CHM, as approved and agreed to by Sheriff Glanz, that "a qualified healthcare professional will perform an inmate assessment within 14 days of the inmate's arrival at the facility."  In August 2009, the Oklahoma Department of Health notified Sheriff Glanz and CHMO/CHC/CHM that this policy is inadequate and in direct conflict with the Oklahoma Jail Standards.  Yet, despite their knowledge of its deficiencies and the excessive risks to the health and safety of inmates like Mr. Williams, neither Sheriff Glanz nor CHMO/CHC/CHM amended or revised the policy.  In general, Sheriff Glanz and CHMO/CHC/CHM encourage under-qualified medical staff to respond to and manage even the most complex and serious medical and mental health crises.  Sheriff Glanz and CHMO/CHC/CHM have engendered a lax environment where timely assessment and treatment by qualified professionals are not emphasized.  In many cases, inmates *never* receive the assessment or treatment they need.  For instance, Mr. Williams never received any assessment, evaluation or treatment for possible head trauma and/or neck injury from a qualified professional, despite the obvious and emergent need.  There are instances when other inmates did not receive timely treatment, resulting in death and permanent loss of eyesight.  Nonetheless, despite this known pattern of tragic outcomes due to delayed or denied

treatment, Sheriff Glanz and CHMO/CHC/CHM have failed to abate the deficiencies in deliberate indifference to the health and safety of inmates like Mr. Williams.

61.     Third, CHMO/CHC/CHM and Sheriff Glanz have maintained a policy, practice and/or custom of understaffing the medical unit, which poses known, obvious and excessive risks to the health and safety of inmates like Mr. Williams.  There are only two nurses assigned to the medical unit at any one time. These two nurses are inadequate in quantity and are also unqualified to manage, monitor and treat the conditions of inmates like Mr. Williams with complex and serious mental health and medical needs.  There is only one psychiatrist and one physician serving the entire Jail.  Neither the psychiatrist nor the physician is present at the Jail on the weekends, despite the fact that weekends are typically the busiest time at the Jail. Consistent with the understaffing policy, practice and/or custom, there was no psychiatrist or physician at the Jail when Mr. Williams was booked.  There was no qualified provider on-site to assess or treat Mr. Williams' obvious, emergent and serious mental health and medical needs. Also, while the Jail's own policies require that there are always at least two D.O.s in the medical unit, Sheriff Glanz has repeatedly violated his own policy by assigning only one D.O. to the medical unit.  CHMO/CHC/CHM's practice of understaffing the Jail's medical unit is consistent with a corporate strategy and policy exhibited at the Oklahoma County Jail.  CHMO/CHC/CHM and Sheriff Glanz have been put on notice, through litigation and findings of the Department of Justice, that this understaffing policy poses an excessive risk to the health and safety of inmates like Mr. Williams.  Nonetheless, CHMO/CHC/CHM and Sheriff Glanz have disregarded the excessive risk.   Sheriff Glanz and CHMO/CHC/CHM's understaffing of the medical unit constitutes deliberate indifference to the health and safety of inmates like Mr. Williams.

62.    Fourth, Defendants Glanz and CHMO/CHC/CHM are responsible for a policy, practice or custom of inadequate medical triage screening that fails to identity and classify inmates with serious medical or mental health needs.  The inadequate medical triage screening system creates known, obvious and excessive risks that inmates like Mr. Williams with serious and emergent mental health or medical needs will not receive timely and necessary evaluation or treatment.  Defendants Glanz and CHMO/CHC/CHM have been on notice of the deficient medical triage screening system since at least August 2009, but have failed to take sufficient remedial action in deliberate indifference to excessive risks to the health and safety of inmates like Mr. Williams.

63.    Fifth, Sheriff Glanz and CHMO/CHC/CHM have maintained a policy, practice and/or custom of severely limiting the use of off-site medical, mental health and diagnostic service providers, even in emergent situations, in disregard to known, obvious and excessive risks to the health and safety of inmates like Mr. Williams.  Sheriff Glanz and CHMO/CHC/CHM have strongly discouraged their employees and agents from sending inmates to any hospital or other off-site medical, mental health or diagnostic service providers.  This is due to the fact that, per contract, CHMO/CHC/CHM is limited to a capped aggregate amount of $600,000 per contract, per year, for costs associated with the provision of off-site medical or other health care services.  Off-site medical costs in excess of the capped amount are the responsibility of the Tulsa County Sheriff's Department.  By severely curtailing the use of off-site medical, mental health or diagnostic service providers, Sheriff Glanz and CHMO/CHC/CHM assure that inmates with specialized and serious medical, mental health and diagnostic needs that cannot be adequately assessed or treated on-site, like Mr. Williams, will simply not receive the care they need.

64.     Sixth, Sheriff Glanz and CHMO/CHC/CHM have failed to adequately train Jail personnel and staff with respect to the proper assessment, classification and treatment of inmates with serious mental health needs and/or head trauma.  This failure to train constitutes deliberate indifference to the health and safety of inmates like Mr. Williams.

65.     Sheriff Glanz and CHMO/CHC/CHM are, and have been, on notice that their policies, practices and/or customs are inadequate to meet the medical and mental health needs of inmates like Mr. Williams.  Nonetheless, Sheriff Glanz and CHMO/CHC/CHM have failed to reform those policies, practices and/or customs.  In addition to the aforementioned Department of Health and Department of Justice (involving CHMO/CHC/CHM practices at Oklahoma County Jail) investigation and findings, within the last five (5) years, a CHMO/CHC/CHM director at the Tulsa County Jail, Pamela Hoisington, was terminated for voicing her complaints about many of the woefully inadequate policies set forth above.  Ms. Hoisington actually documented some of her complaints in writing in a judicial letter.  However, rather than taking a proactive approach to improve the inadequate policies, practices and/or customs, CHMO/CHC/CHM fired Ms. Hoisington at the direction of Sheriff Glanz for allegedly exposing the Tulsa County Sheriff's Department to litigation.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Cruel and Unusual Punishment in Violation of the Eighth
and/or Fourteenth Amendments to the Constitution of the United States
(42 U.S.C. § 1983)**

**A.     Allegations Applicable to all Defendants**

66.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 65, as though fully set forth herein.

67. Defendants knew there was a strong likelihood that Mr. Williams was in danger of serious personal harm and that he would try to harm himself and/or had suffered serious head or neck injuries. Mr. Williams had obvious, serious and emergent mental health and medical issues, including acute suicidal thoughts and tendencies and probable head trauma or neck injuries, made known to Defendants prior to his death.

68. Nonetheless, Defendants disregarded the known and obvious risks to Mr. Williams' health and safety.

69. Defendants failed to provide, *inter alia*: an adequate or timely mental health evaluation, any assessment, including MRI or CT scan, of Mr. Williams' probable head trauma and/or neck injury, proper classification and segregation of Mr. Williams as being mentally ill, timely or adequate mental health and/or medical treatment and/or adequate monitoring and supervision for Mr. Williams while he was placed under their care, in deliberate indifference to Mr. Williams' serious medical needs, health and safety.

70. As a direct and proximate result of Defendants' conduct, Mr. Williams experienced physical pain, severe emotional distress, mental anguish, loss of his life, and the damages alleged herein.

71. As a direct and proximate result of Defendants' conduct, Mr. Williams' heirs have suffered damages, including, but not limited to, pecuniary loss (including lost wages), loss of consortium, grief, loss of companionship, pain and suffering.

**B.    Supervisor Liability (Sheriff Glanz)**

72.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 71, as though fully set forth herein.

73.    There is an affirmative link between the aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Mr. Williams' serious medical needs, health and safety and policies, practices and/or customs which Sheriff Glanz promulgated, created, implemented and/or possessed responsibility for.

74.    Such policies, practices and/or customs include, but are not limited to:

a.    The failure to promulgate, implement or enforce, adequate mental health policies responsive to the serious medical needs of inmates like Mr. Williams;

b.    Inadequate medical triage screening that fails to identity inmates with serious medical or mental health needs;

c.    Severe limitation of the use of off-site medical, mental health and diagnostic service providers, even in emergent situations;

d.    Untimely medical and mental health examinations and treatment;

e.    Understaffing the medical unit; and

f.    The failure to adequately train Jail personnel and staff with respect to the proper assessment, classification and treatment of inmates with serious mental health needs and/or head trauma.

75.    Sheriff Glanz knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Mr. Williams.

76.     Sheriff Glanz disregarded the known and/or obvious risks to the health and safety of inmates like Mr. Williams.

77.     Sheriff Glanz, through his continued encouragement, ratification, and approval of the aforementioned policies, practices, and/or customs, in spite of their known and/or obvious inadequacies and dangers, has been deliberately indifferent to inmates', including Mr. Williams', serious medical needs.

78.     There is an affirmative link between the unconstitutional acts of his subordinates and Sheriff Glanz's adoption and/or maintenance of the aforementioned policies, practices and/or customs.

79.     As a direct and proximate result of the aforementioned policies, practices and/or customs, Mr. Williams and Mr. Williams' heirs suffered injuries and damages as alleged herein.

**C.    Municipal Liability (CHMO, CHC and CHM)**

80.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 79, as though fully set forth herein.

81.     CHMO, CHC and CHM are each a "person" for purposes of 42 U.S.C. § 1983.

82.     At all times pertinent hereto, CHMO, CHC and CHM were acting under color of state law.

83.     CHMO is charged with implementing and assisting in developing the policies of the Tulsa County Sheriff's Department with respect to the medical and mental health care of inmates at the Tulsa County Jail and has shared responsibility to adequately train and supervise its employees.

84.     CHM employees and officers are involved in, and exert control over, the Jail's mental health program, as administered by CHMO.   For instance, CHM is involved in the

management of psychiatric treatment and monitoring psychotropic medication usage at the Jail. CHM is also heavily involved in the ongoing evaluation of the Jail's mental health program and involved in the day-to-day management of the program. CHM closely monitors the Jail's mental health program and provides consult support, staff coverage, professional development and training and peer review.

85.     CHC is the parent corporation of, and controls, CHMO and CHM. CHC controls the policies and practices of CHMO and CHM, particularly with respect to mental health care provided at the Tulsa County Jail.

86.     There is an affirmative link between the deprivation of Mr. Williams' right to be free of cruel and unusual punishment and policies, practices and/or customs which CHMO, CHC and CHM promulgated, created, implemented and/or possessed responsibility for.

87.     Such policies, practices and/or customs include, but are not limited to:

a.      The failure to promulgate, implement or enforce adequate mental health policies responsive to the serious medical needs of inmates like Mr. Williams;

b.      Inadequate medical triage screening that fails to identify inmates with serious medical or mental health needs;

c.      Severe limitation of the use of off-site medical, mental health and diagnostic service providers, even in emergent situations;

d.      Untimely medical and mental health examinations and treatment;

e.      Understaffing the medical unit; and

f.      The failure to adequately train CHMO/CHC/CHM employees and/or agents with respect to the proper assessment, classification and treatment of inmates with serious mental health needs and/or head trauma.

88.     CHMO, CHC and CHM knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Mr. Williams.

89.     CHMO, CHC and CHM disregarded the known and/or obvious risks to the health and safety of inmates like Mr. Williams.

90.     CHMO, CHC and CHM tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, knew (and/or it was obvious) that such conduct was unjustified and would result in violations of constitutional rights, and was deliberately indifferent to the serious medical and mental health needs of inmates like Mr. Williams.

91.     As a direct and proximate result of the aforementioned policies, practices and/or customs, Mr. Williams and Mr. Williams' heirs suffered injuries and damages as alleged herein.

### SECOND CLAIM FOR RELIEF

#### Negligence/Wrongful Death
#### (Defendants CHMO, CHC, CHM, Chappell, Luca, Hightower, Does I through X)[1]

92.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 91, as though fully set forth herein.

93.     Defendants owed a duty to Mr. Williams, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate assessment, evaluation, treatment and supervision.

---

[1]     Plaintiff's tort claims are properly brought against CHMO, CHC and CHM and their employees and agents.  The Oklahoma Supreme Court held in *Sullins v. American Medical Response of Oklahoma, Inc.,* 23 P.3d 259, 264 (Okla. 2001), that a private entity such as CHMO/CHC/CHM is not an "entity designated to act in behalf of the State or political subdivision [which includes a public trust]" for the purposes of the exemption under 51 Okla. Stat. § 152(2), merely because it contracts with a public trust to provide services which the public trust is authorized to provide.  *See also Arnold v. Cornell Companies, Inc.,* 2008 WL 4816507 (W.D.Okla., Oct. 29, 2008).

94.    Defendants breached that duty by failing to provide Mr. Williams with prompt and adequate medical and psychiatric assessment, evaluation, treatment and supervision despite the obvious need.

95.    Defendants' breaches of the duty of care include, *inter alia*, the failure to: provide an adequate or timely mental health evaluation; provide any assessment, including MRI or CT scan, of Mr. Williams' probable head trauma and/or neck injury; provide proper classification and segregation of Mr. Williams as being mentally ill; provide timely or adequate mental health and/or medical treatment for Mr. Williams; conduct appropriate psychiatric and medical assessment; promptly evaluate and transfer Mr. Williams to an appropriate and qualified psychiatric treatment or medical facility; provide adequate monitoring or supervision of Mr. Williams' condition (including, *inter alia*, the failure to take his vital signs); and take precautions to prevent Mr. Williams from harming himself or otherwise being harmed.

96.    As a direct and proximate cause of Defendants' negligence, Mr. Williams experienced physical pain, severe emotional distress, mental anguish, loss of his life, and the damages alleged herein.

97.    As a direct and proximate cause of Defendants' negligence, Mr. Williams' heirs have suffered damages, including, but not limited to, pecuniary loss (including lost wages), loss of consortium, grief, loss of companionship, pain and suffering.

## PUNITIVE DAMAGES

98.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 97, as though fully set forth herein.

99.     Plaintiff is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts and omissions alleged herein constitute reckless or callous indifference to Mr. Williams' federally protected rights.

100.     Plaintiff is entitled to punitive damages on her negligence/wrongful death claim against Defendants CHMO, CHC, CHM, Chappell, Luca and Hightower as their conduct, acts and omissions alleged herein constitute reckless disregard for Mr. Williams' rights.

WHEREFORE, based on the foregoing, Plaintiff prays that this Court grant the relief sought, including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

Date:   April 16, 2012

s/ Louis W. Bullock
Louis W. Bullock, OBA #1305
lbullock@bullock-blakemore.com
Patricia W. Bullock, OBA #9569
pbullock@bullock-blakemore.com
Robert M. Blakemore, OBA #18656
bblakemore@bullock-blakemore.com
Bullock Bullock & Blakemore PLLC
110 West Seventh Street, Suite 707
Tulsa, OK 74119
Phone:  (918) 584-2001
Fax:  (918) 779-4383

Daniel Smolen, OBA #19943
danielsmolen@ssrok.com
Donald E. Smolen, II, OBA #19944
donaldsmolen@ssrok.com
Laura M. Lauth, OBA #22619
lauralauth@ssrok.com
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone:  (918) 585-2667
Fax:  (918) 585-2669

Gregory J. Denney, OBA No.17918
greg@gregdenneylaw.com
Gregory J. Denney & Associates, P.C.
1204 South Cheyenne Avenue
Tulsa, Oklahoma 74119
Telephone: (918) 295-0077
Facsimile:  (918) 295-8578

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of April, 2012, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Clark Brewster
cbrewster@brewsterlaw.com

Corbin Brewster
ccbrewster@brewsterlaw.com

Guy Fortney
gfortney@brewsterlaw.com

Steven Holden
steveholden@holdenlitigation.com

Michael L. Carr
mikecarr@holdenlitigation.com

Jane Cowdery
janecowdery@holdenlitigation.com

s/ Louis W. Bullock