## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ROBBIE EMERY BURKE, | ) | |
| as the Special Administratrix of the Estate | ) | |
| of Elliott Earl Williams, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 11-CV-720-JED-PJC |
| | ) | |
| STANLEY GLANZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

I.      **Introduction** [1]

         In October 2011, Elliott Williams, a 37 year old mentally ill and suicidal man arrested on

a misdemeanor charge of obstructing an officer, was taken to the Tulsa County Jail (Jail) by

police officers employed by the Owasso Police Department (OPD).  Shortly after being placed in

a cell at the Jail, Mr. Williams rammed his head into the cell door, seriously injuring himself.

Despite a Jail trusty's report of seeing the head ramming and Williams's consistent reports that

he could not move his legs and believed he had a broken neck, he received no medical treatment

for over five days.  He died on his sixth day at the Jail, due to complications from serious injuries

to his cervical vertebrae and spinal cord, which, left untreated, caused a hematoma to travel up

his cervical spine, shutting down his spinal cord and causing his respiratory muscles to cease

working.

         In addition to the Jail's failure to provide any treatment for Mr. Williams's serious

injuries for days, there is other evidence from which a reasonable jury could infer that Mr.

Williams was treated inhumanely at the Jail.  For example, after he reported that he believed his

---

[1]  The facts described herein are supported by record evidence and are thus taken as true, with all
reasonable inferences drawn in plaintiff's favor, as is required at the summary judgment stage.

neck was broken and that he could not move his legs and subsequently defecating on himself, Jail detention officers placed Mr. Williams on a gurney and, when he could not get off the gurney or stand in the shower to clean himself, Jail staff tipped the gurney up onto two wheels to dump Williams off and into the shower.  He fell off the gurney onto the floor of the shower, where he hit his head, and was then left in the shower for as long as three or more hours.  During that time, he was heard screaming "help me."

Mr. Williams also reported severe pain which he felt was inside his stomach, stated that he felt like something was in his rectum, and yelled repeatedly for nurses to cut out whatever was inside him.  At other times, he reported pain all over and yelled "throughout the night." Williams repeatedly told numerous Jail staff that he could not move his legs.  Still, he did not receive any medical treatment or evaluation.

No physician saw Mr. Williams for over two days after he reported a broken neck and paralysis and, when a physician – the Jail's part-time psychiatrist – finally did visit, he did so for approximately 11 to 12 minutes, conducted no medical evaluation, and did not make any referral or order for medical treatment.  Jail staff confined him in a "medical" unit cell without providing any medical care, they tossed styrofoam food containers into his cell, placed one small cup of water near him, and otherwise did little to nothing for him, all because some staff purportedly doubted that the etiology of his paralysis was medical.  Yet, records show that many of the Jail's staff understood that there was reason to be concerned about Mr. Williams's condition, even though they did nothing for him.

Mr. Williams had been placed in a video-monitored cell for the alleged purpose of ruling out paralysis and "respond[ing] to any medical/psychiatric condition."  Anyone who bothered to monitor the video-recorded cell would have noticed that he did not appear to move his feet or

legs and, despite the minimal movement he accomplished with his arms, he was unable to open any food container or lift or drink from the one and only small cup of water that was provided to him in the last 50 hours of his life.[2]

For more than two days, Williams had no food or water, although Jail records show that he requested water numerous times, and he could be seen on the video attempting, unsuccessfully, to open a styrofoam food container. The day before he died, no Jail staff bothered to enter his cell, although he had been lying on his back for days, without the ability to eat, drink, or use a toilet.  During at least his last several hours of life, Mr. Williams's speech was slurred and less intelligible, but still he received no medical attention.  Even after some Jail personnel were alarmed by his condition, hours passed without anyone calling for an ambulance or providing even the most minimal care for him.  When he was found completely unresponsive on October 27, 2011, CPR was belatedly performed for a short time, then the blanket on which he had laid for days was yanked out from under him, so that his lifeless body rolled roughly, landing face down. It appears that the only attempted medical treatment he received in his six days at the Jail was the CPR performed *after he was found unresponsive.*

Mr. Williams's estate brings this suit against the following: Owasso police officers who arrested and/or transported him to the Jail instead of a mental health treatment facility; Stanley Glanz, in his individual capacity as the former Sheriff; and current Sheriff Vic Regalado, in his official capacity.  Plaintiff asserts claims under 42 U.S.C. § 1983 for cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. The defendants seek summary judgment.

---

[2]   As noted, the last 50 plus hours of Mr. Williams's life were spent in a video-recorded "medical" cell.  The Court has viewed the condensed video, which plaintiff has represented reflects any time there was movement in that cell.  (Doc. 263-2.)  That video was made publicly available by the Tulsa World at https://vimeo.com/69508767, as well as other news outlets.

## II.       Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The Court may not weigh the evidence and may not credit the evidence of the moving party and ignore the non-movant's evidence. *Tolan v. Cotton*, 572 U.S. ___, 134 S. Ct. 1861, 1866 (2014) (per curiam).

## III.      The Evidence

### A.       The Arrest in Owasso

Late on October 21, 2011, Jack Wells and Ben Wolery, OPD officers, responded to a call from an Owasso, Oklahoma hotel. When they arrived at the hotel, they were met by Earl Williams, his son, Elliott Williams, and Elliott's brother, Clifton Williams. Earl Williams explained that he had rented Elliott a room because Elliott had not slept in days and was having psychological issues. As Earl walked toward the room after check-in, Elliott threw a soda on the hotel lobby floor and ran into the doors at the entrance, dislodging one door from its track.[3]

---

[3]   Officers Wolery and Wells were equipped with audio and video recording devices, and the Court has viewed those recordings and a related transcript. (*See* Doc.  222-4, 222-6; *see also* Doc. 222-5 [transcript]).

According to a written report by Officer Wells, it "was readily apparent that [Williams] was having a mental breakdown.  [He] was rambling on about God, eating dirt, and then rambling on incoherently."  (Doc. 222-3 at 4).  Hotel management informed the officers that the hotel staff had fixed the door and had no intention of pressing charges, but they wanted Mr. Williams to leave the hotel.  Earl told the officers that Elliott could not come home with Earl in his current state because Earl's wife had just had a cancer surgery.  Earl Williams also revealed that Elliott Williams and his wife were in the midst of a separation, leaving him depressed.

Williams initially denied that he was suicidal or depressed, but he continued to ramble, and his father informed the police that Williams had "been diagnosed with bipolar from the military."  (Doc. 222-5 at 8).  Officer Wells felt that, to that point, Williams had done nothing to justify an arrest or detention, and Wells did not believe the Tulsa Center for Behavioral Health (TCBH), an adult crisis center, would admit Williams, as he had not yet "said he's going to hurt himself." (*Id.* at 10). Wells understood that Williams was "pretty much in a crisis moment." (*Id.* at 16).  The officers decided to call Community Outreach Psychiatric Emergency Services (COPES), which offers around-the-clock mobile emotional or behavioral disturbance or psychiatric emergency services. Dispatch informed the officers that COPES was en route, and Wells, speaking into a telephone, said "No, this one is having a complete and utter mental breakdown at the moment. . . . So, uh, we'll see what COPES can do."  (Doc. 222-5 at 17).

Mr. Williams was then seated on a curb. Williams's father "asked [Williams] if [he] had told his wife that he was going to kill himself.  After [his father] repeat[ed] the question several times, [Williams] stated that he had in fact told his wife that he was going to kill himself."  (Doc. 222-3 at 4).  At this point, the situation, in Wells's words, went "south and sideways."  (Doc. 222-1 at 73:16).  Williams stood up from the curb and refused to sit back down.  He said he was

no longer married and his wife was gone, and he pulled his shirt down to expose a tattoo over his heart. Williams "began stating that he was going to commit suicide tonight," and he pleaded with the officers to shoot him, stating "it's a suicide."  (Doc. 222-3 at 5; Doc. 222-5 at 24).  After officers reported that they did not want to hurt him, Williams asked whether they needed to be provoked and subsequently took a step toward Officer Wolery. Officer Wells then sprayed Mr. Williams in the face with pepper spray, then called for medics to flush Williams's face.

Owasso medics and OPD Sergeant H.D. Pitt arrived on the scene.  The medics flushed Mr. Williams's face, and Wells told Pitt "what all had transpired."  (Doc. 222-1 at 19:16).  Pitt radioed dispatch and told them to cancel COPES. Wells handcuffed Williams and placed him under arrest for misdemeanor obstruction.  Wells's contemporaneous report summarized the events as follows: "Copes was called for the suspect do [sic] to showing signs of being in crisis. Suspect attempted to have officers kill him.  Suspect was pepper sprayed and taken into custody after approaching officers and refusing to comply to [sic] lawful commands." (Doc. 222-3 at 20).

### B.     The Owasso Jail

Upon arrest, officers took Mr. Williams to the Owasso Police Department and placed him in a jail cell. OPD jailers monitored him on a surveillance camera while Wells completed booking procedures.  Reports completed by Wells indicated that Williams was "suicidal" and answered affirmatively to the question, "Do you feel suicidal, or have you though[t] about harming yourself in the past 24 hours?"  (Doc. 222-3 at 10).  Williams spent approximately two and one-half hours in the OPD cell, from about 10:30 p.m. on October 21, 2011 until OPD officers removed him from the cell at 1:08 a.m. on October 22, 2011.  Video of Williams inside that cell is disturbing.  (*See* Doc. 263-9).  Williams moaned, sobbed loudly, rocked, paced, shook his head back and forth, sang "Jesus" repeatedly, banged his head against a wall and, later, the

door to the cell, crouched and crawled on his hands and knees, pulled off his pants and scratched his legs, removed the small mattress from a bed in the cell and placed the mattress beneath the bed, crawled under the bed and flopped around on the floor, stuck his head out to use his mouth and/or teeth to grab his pants from the floor, rolled his body repeatedly, and screamed.

OPD jailers monitoring video feed of the cell informed Wells that Williams was acting strangely and had crawled beneath the bed.  Officers Wells, Pitt, and Lem Mutii entered the cell and observed Mr. Williams under the cot.  When they asked Williams to come out, he partially exited the space under the cot and moaned or growled, then retreated.  Mutii coaxed Williams out from under the bed, and Williams was then cuffed for transport to the Tulsa County Jail.

### C.      The Tulsa County Jail

#### 1.      First Day: October 22, 2011

*-- Pre-Booking Area --*

OPD Captain Tracy Townsend, off duty, was called in to help Wells transfer Williams to the Tulsa County Jail, which is operated by the Tulsa County Sheriff's Office (TCSO).  Wells informed Townsend of what had occurred.  Upon arrival at the Jail, Wells and Townsend placed Williams in a pre-booking cell at 1:31 a.m. on October 22, 2011 and asked him to change clothes. Officers opened the door about one minute later, and a few minutes thereafter removed Williams from the cell and attempted to handcuff him.  When Williams was not readily compliant, the officers took Williams down to the floor of the pre-booking area, with Wells landing on top of Williams.[4]  The Jail received Williams into booking at approximately 1:50 a.m.

---

[4]  The record contains two videos from the pre-booking area.  (Doc. 222-10, 263-13).  One (Doc. 222-10) covers much of the pre-booking area and reflects the passage of 25 minutes that OPD officers waited while the Jail took custody of Mr. Williams. The other video (Doc. 263-13) shows only part of the pre-booking area, which is where the take down of Mr. Williams occurred.

Although there is evidence that Wells understood that Williams was suicidal and was having a "mental breakdown" and "showing signs of being in crisis," Wells and the other OPD officers made no attempt to try to find any mental health facility that would take Williams. Wells asserted in his deposition that he believed that the Tulsa County Jail would provide mental health treatment for Williams, but he did not recall telling Jail staff that Williams was suicidal or having mental health problems or informing them that the OPD officers brought Williams to the Jail to obtain mental health assistance.  However, Wells provided his booking reports to the Jail. Whether or not Jail staff reviewed any of the paperwork is unknown.  But after the Jail took custody of Mr. Williams, he was not initially placed on suicide watch in the booking area, and Williams was severely injured just over one hour later, before booking was even completed.

*-- Injury in the Booking Area --*

Jail staff moved Williams into a booking area holding cell at 2:15 a.m. on October 22, 2011. (Doc. 224-2 at 4).  Less than an hour later, at approximately 3:00 a.m., another inmate, Mario Wilson, who was working as a trusty in the booking area, witnessed Williams ram his head into the door of his cell and go to the ground.  Wilson immediately alerted detention staff. According to Wilson, Williams lay on the ground for roughly 20 minutes before detention staff responded and called a nurse.  (*Id.*).  When Jail officials – Corporal Jackson, Deputy Holloway, and Licensed Practical Nurse (LPN) Hughes – responded, Mr. Williams was found lying face-up in the cell.  He told them that he had rammed his head into the door and "broke his neck," and he said "I can't move.  I can't move." (Doc. 263-18 at 1; Doc. 263-10 at 22).[5]

---

[5]   Defendants argue that plaintiff's exhibits 10 and 17 (Doc. 263-10, 263-18) are inadmissible hearsay.  The Court disagrees, as those exhibits are reports prepared by a TCSO representative, Billy McKelvey, as part of the investigation into the death of Mr. Williams.  They are, by definition, not hearsay under Fed. R. Evid. 801(d)(2)(D).

Despite Williams's reports of neck injury and paralysis, he was left in the holding cell, untreated, for the next 10 and one half hours. (Doc. 263-18 at 1).  During that time, the Jail's Detention Supervisors – Watch Commander Captain Wood, Booking Supervisors Corporal Jackson and Sergeant Housley, and the Housing Supervisor, Sergeant Reusser – and three Jail nurses – LPN Hughes, LPN Taylor, and Registered Nurse (RN) Chappell – "all had knowledge of [Williams's] complaints of neck injury." (263-18 at 1-2).  Williams, injured and immobile, eventually defecated where he lay.  (Doc. 263-10 at 3067-3068, 3085, 3097).

-- *"Medical Emergency" but No Medical Treatment* --

At some time between 1:22 p.m. and 1:30 p.m., when a booking nurse, Faye Taylor, and a detention officer, Heather Reed, found Williams "unable to get up," a "medical emergency" was declared. (Doc. 263-10 at 3067; Doc. 263-23). Despite the medical emergency, Mr. Williams did not receive any medical treatment when taken to the medical unit.  A Jail nurse reportedly took his blood pressure and scraped the bottom of his foot with a pen to test his reflexes.  According to Jail trusty Derrick Latham, on the first 2 foot scrapes there was no movement, and on the third scrape, "[h]is foot like barely moved."  (Doc. 263-25 at 4-5).[6]

According to Latham, the "head nurse" kept complaining of Williams's smell, and she cussed at and berated Williams, telling him that he should be "ashamed" of himself, to get his "nasty ass" in the shower, and to "quit f[uck]ing faking."  (Doc. 263-24 at 20:11 – 21:10; Doc. 263-25 at 5; *see* Doc. 263-10 at 3136).  The Jail's nurses "d[id]n't like working on anybody that's got feces on 'em and smells that way," so it fell to detention officers, including Jail Captain Tommy Fike and Sergeant Doug Hinshaw, to clean Mr. Williams.  (Doc. 263-10 at

---

[6] Although there is evidence that Williams's vital signs were taken after the medical emergency was called (Doc. 263-10 at 3088), an entry by nurse Taylor into the Jail's computer system for medical notes indicated that staff were "unable to obtain vital signs." (Doc. 263-23 at 5).

3069).  Outside the medical unit shower, Fike and Hinshaw directed Williams to get up from the gurney, but Williams groaned and told them that he could not feel his body or get up.  Even though Williams told them that he could not move, Fike and Hinshaw lifted the top of the waist-high gurney and "dumped" Mr. Williams off the gurney into the shower, where Williams hit his head with a "smack."  (Doc. 263-1 at 152; Doc. 263-10 at 3092-93; Doc, 263-24 at 24; Doc. 263-25 at 5-6).  Hinshaw and Fike then removed Williams's pants and shirt, and one of the Jail staff turned on the shower water.  (Doc. 263-10 at 3095; Doc. 263-25 at 8).

Williams was left in the shower, initially face up, for a long time, then was rolled over so that he was face down and again left in the shower for a lengthy amount of time.  According to witnesses, Williams was left in the shower for some time between approximately one hour and ten minutes and as much as three or more hours.  (*See, e.g.*, Doc. 263-10 at 3069-70, 3096).  Detention Officers Christopher Leverich and Cindy West were asked to assist in moving Williams from the shower to a medical unit cell.  When they arrived at the shower, they saw Williams, face down.  (Doc. 263-10 at 3069, 3094).  According to Leverich, Williams was screaming "help me." (*Id.* at 3094).  Hinshaw directed Leverich to roll Williams over onto his back and to lift Williams.  (*Id.*).  A trash bag was placed on the gurney because "there was stuff leaking out [of] Williams['s] rectum."  (*Id.* at 3069).  Leverich grabbed Williams behind the kneecaps, and he, Hinshaw, and West lifted Williams onto the gurney.  (*Id.* at 3069, 3094).  Leverich indicated that "[i]t looked like [Williams] . . . had extreme lack of oxygen" because his skin was a "purplish color."  (*Id.* at 3094).

Following the shower, Mr. Williams was placed in cell number 26 in the medical unit.  Leverich helped put Williams on a metal bunk, with a blanket either under or over him.  (*Id.* at 3070, 3094).  Williams "was screaming that he needed something to drink," and Captain Fike

helped give Williams a drink.  (*Id.* at 3094).  Leverich indicated that Williams could not "move his arms or anything." (*Id.*).   West has indicated that Hinshaw noticed a discoloration in Williams's left arm and called for a nurse.  (*Id.* at 3070).  According to Leverich, he, Hinshaw, Fike and Bell all discussed the fact "that something's wrong with Williams."  (*Id.* at 3094).

Throughout the first day at the Jail, Mr. Williams continued to tell his captors that he was paralyzed and unable to move or walk.  Detention Officers Carmelita Norris and Dakota Walsh were assigned to the medical unit from 7:00 p.m. on October 22 to 7:00 a.m. on October 23. (*See* Doc. 263-10 at 3105-06).  While Norris did security checks during that shift, Williams called out for water multiple times.  (*Id.* at 3104-3106).  Norris indicated that Williams did not walk, stand, or sit under his own power during that 12 hour shift, and Williams could not sit up to drink or eat, although she saw Williams's feet twitch and move a little.  (*Id.* at 3105).  Walsh opened and held the door to Williams's cell, while Norris and a trusty, Andrew Johnson, entered to give Williams some water.  (*Id.*).  To give him water, Norris had to raise Williams's head and part of his back to bring him into a position and then pour water into his mouth.  (*Id.* at 3104, 3106).  Norris also fed Williams a bologna sandwich, which required that she "hold the sandwich for him and hold his head, well it was his head and his neck area and raise[ ] him up in order to give him the sandwich, ma[k]e sure he completely chewed the sandwich and it was swallowed and then I would give him more until he had ate the entire sandwich."  (*Id.* at 3104-05).

Williams informed Norris and Walsh that he could not move (*Id.* at 3104-06).  Walsh said that Williams "was unable to move" and that he "was making it very clear through the whole night that he was unable to move."  (*Id.* at 3106-07).  At around 11:00 p.m. that night, one of the Jail nurses, Raymond Stiles, LPN, entered the following "Progress Note":  "[Williams] states that he cannot walk.  However booking staff states he did not use wheel chair [sic] or any

other walking aid when brought into Jail.  Continues to tell Nursing staff here that he just cannot walk, or even pull blankets over his shoulder.  Wants to be waited on." (Doc. 263-23 at 0093).

### 2.    *Days Two, Three, and Four – October 23 to 25, 2011*

Over the next few days, Williams lay naked on a blanket in his cell and continued to report paralysis.   Leticia Glover, a detention officer who was on duty October 23 and 24, reported that Williams "was yelling out saying he can't feel his legs" and that he yelled "throughout the night." (Doc. 263-10 at 3093).  Detention Officer Glover informed nursing staff that Williams "wants something" and asked that they "at least go down there and look at him," but no one did. (*Id.* at 3093-94).  At 6:27 a.m. on October 24, near the end of his shift, LPN Stiles recorded that Williams "continues to state he can't walk oe [sic] move.  But when his suicide blanket slides off he manages to get it back over his body without asst [sic]." (Doc. 263-23 at 0094).  On the evening of October 24, John Bell, a member of the Jail's mental health staff, recorded that Williams would "lie on bed and not respond to . . . questions," "acted as if paralyzed," and said "I want water." (*Id.*).  Williams still received no medical care.  Instead, Bell recorded in notes that he provided Williams "education" regarding "coping skills." (*Id.*).

Dr. Stephen Harnish, the Jail's part-time psychiatrist, indicated that he was first notified of Williams's condition on Monday, October 24, over two days after Williams complained of a broken neck and paralysis. (Doc. 263-10 at 3071; Doc. 263-28 at 44-46).[7]  Harnish has testified that Jail staff made him aware that "there was a concern that [Williams] was saying he was

---

[7]  There is conflicting evidence as to when Harnish was first informed.  He testified that he learned of the staff concerns about Mr. Williams on Monday (which would have been October 24), but records reflect that he did not visit Williams until October 25. Other evidence further indicates that Harnish first learned of and visited Williams on October 25, and the video reflects a visit from Harnish from approximately 9:07 a.m. to 9:18 a.m. on October 25. (Doc. 263-2).  Hence, Dr. Harnish well may have been first notified of Williams's dire condition three days following a passel of complaints to nurses, detention officers assigned to the medical unit, detention supervisors, and others.

paralyzed; that he wasn't moving.  There was a question of whether he had been active in booking." (Doc. 263-28 at 45).  Harnish was also informed that Williams was "alleging that he had run into the door and was paralyzed" and "knew that [Williams] was confused as to where he was," (Doc. 263-11 at 0030; Doc. 263-28 at 45, 91), yet Harnish did not order a neurological exam or "any type of a medical examination to determine if there was a reason for that paralysis," as his team was focused "on the psychiatric aspects of this particular person's case." (Doc. 263-28 at 46, 50).

Instead of providing or ordering medical care, Harnish ordered Jail staff to place Mr. Williams in Medical Cell number 1, which would be his burial crypt.  Medical Cell 1 was video-monitored, to determine whether Williams was actually paralyzed or to "respond to any medical/psychiatric condition as determined by . . . monitoring."  (Doc. 263-11 at 0030; Doc. 263-1 at 123; Doc. 263-28 at 50; Doc. 263-23 at 0098).  Detention officers carried out Harnish's order at 8:27 a.m. on October 25, 2011.  They placed Williams on a blanket and dragged him, naked, into Medical Cell 1.  The remainder of Williams's life was recorded by a video camera. (*See* Doc. 263-2).

At 8:39 a.m. on October 25, a detention officer entered Medical Cell 1 and placed a small cup of water at his feet.  At approximately 9:07 a.m., Dr. Harnish visited Mr. Williams for the first and only time, for approximately 12 minutes. (Doc. 263-10 at 3071-72; Doc. 263-28 at 91). According to Dr. Harnish, Williams's "focus" was "on wanting to have a bucket of water and a tube so that he could drink."  (Doc. 263-28 at 91).  Harnish moved Williams's water cup within reach of his right arm.  (Doc. 263-2).  Although Harnish "had not ruled out that - - that [Williams's] reported paralysis might have been the result of an injury" and had conducted no medical evaluation, Harnish recorded that he "doubt[ed the] medical etiology of [Williams's]

claimed paralysis." (Doc. 263-23 at 0098; Doc. 263-28 at 101).  According to mental health team member Patricia Benoit, after the brief interview with Mr. Williams, Dr. Harnish reported his opinion that "I don't think this is medical but it is really hard to tell."  Benoit indicated that "[i]t was really hard to tell if it was psychosomatic or if it was physical."  (Doc. 263-10 at 3075).  Yet, no one evaluated Williams to rule out a medical cause.[8]

At approximately 10:10 a.m., an hour and forty minutes after Williams was dragged into Medical Cell 1, a Jail staff member opened the door and tossed a food container on the floor.  It would remain there, untouched and out of reach, for the next two days.  (Doc. 263-2).  Several hours passed and then, between 1:15 p.m. and 2:10 p.m., Williams, alone, appeared to make several attempts to lift the water cup.  He did not succeed.  (*Id.*).  At around 4:40 p.m., a staff member entered Williams's cell and threw a second food container toward him.  This food container landed within reach.  (*Id.*).  Over the following 10 to 15 minutes Williams attempted, with one arm, to open the second food container and again to lift the cup of water.  He was unable even to lift the container's styrofoam lid, let alone bring the cup of water to his lips.  (*Id.*).  From Williams's placement in the video-monitored cell, none of the Jail staff checked to see whether Williams was staying properly fed or hydrated.  (Doc. 263-1 at 172).

Kimberly Hughes, LPN, who had first encountered Mr. Williams on October 22, 2011, returned to work from 7 p.m. on October 25 to 7 a.m. on October 26, 2011.  Sometime after she arrived at 7 p.m., she checked on Williams.  "At first, she did not know it was the same guy [she had seen three days before] because he was totally different" and "didn't even look like the same

---

[8]   Even had Mr. Williams's paralysis been psychosomatic, that would not have eliminated the obligation to provide him adequate nutrition and hydration, pain medication, and medical care.  None of those were provided to him, and a reasonable jury could find that he was instead treated inhumanely and in a manner lacking in human decency, as Michelle Robinette, the Detention Chief Deputy of TCSO at the time, has testified. (Doc. 263-1 at 172, 194, 247-248).

person." (Doc. 263-11 at 18; Doc. 263-10 at 3083).  Sometime after 7:00 p.m. on October 25, Hughes opened the slot in Williams's cell door and spoke to him.  (Doc. 263-10 at 3083; Doc. 263-11 at 18).  Williams told her he was paralyzed, and Hughes observed him "lying on his back muttering to himself (unintelligible) and rolling his fingers (close to his chest area).  There was no other response."  (Doc. 263-11 at 18).  According to Hughes, Williams was "out of it" and did not respond to her at all after that.  (*Id.* at 18-19).

### 3.    Day Five – October 26, 2011

No Jail staff member entered Williams's cell on October 26, 2011.  Hughes entered a note at 12:57 a.m. on October 26, reporting that Williams was "muttering, can't understand a word," and that he was "lying on the floor, covered by blanket – will not get up for VS & cannot understant [sic] his 'mutters.'" (Doc. 263-23 at 0095).  Just before 5 a.m., Hughes again "checked on Williams and saw a white residue around his mouth and several spots of white at the top of the blanket like he had spit up." (Doc. 263-11 at 19).  When she called out to Williams through the small slot in the cell door, Williams asked for water, and Hughes responded by directing him to move to the door with his cup. Williams again told her he was paralyzed and could not do it.  (*Id.*).  Hughes then asked Detention Officers Steven Smith and Crystal Rich to open the door to Williams's cell.  Smith and Rich refused to open the door, claiming they could not do so for safety reasons, although there is no evidence that Williams had been violent or aggressive after he rammed his head into the cell door four days before, on October 22, 2011. (*Id.*; Doc. 263-10 at 3083-84).[9]  "If he can get to the door we will give him some water," one of the officers explained, "but if he cannot get to the door we are not going in there.  That's the rules.  We cannot open the door for our safety and your safety."  (Doc. 263-10 at 3084).  Nurse

---

[9]   In interviews after Williams's death, Detention Officers Rich and Smith both claimed that unidentified nurses informed them that Williams was "detoxing." (Doc. 263-10 at 3103, 3118).

Hughes gave up and left.  Although she was concerned about Williams's condition, she did not relay her concerns to her superiors or seek emergency medical attention for Williams.  (*Id.*).

Mr. Williams continued to lay naked and immobile on the floor, at times partially covered with a blanket.  Patricia Benoit, a mental health team member, wrote at 7:26 a.m. on October 26 that Williams was "still refusing to move."  (Doc. 263-23 at 0095).  According to Benoit, Williams "reportedly was given water by the [detention officer] overnight and was told to come to the [slot in the door] to get the water and he did" (*id.*), although the video refutes that claim in that it never shows Williams move his legs or even attempt to get up from the floor, and there are no other records of Williams getting up from the floor.  (*See* Doc. 263-2).  Benoit told Williams that "if he wanted to [be] bailed out by his parents . . . he would have to walk / move to get . . . to the car."  (Doc. 263-23 at 0095).  Notwithstanding that statement, Williams had at that point been held for over four days, without arraignment, bond, or appearance before a judge.

At 7:49 a.m. on October 26, Carmen Luca, LPN recorded that Williams was "stating that he cannot move."  (Doc. 263-22 at 95).  No care was administered, and no one even entered the cell to check on Williams for the entire day of October 26.  Hours later, after 11:00 a.m., Williams again tried and failed to grasp the food container within his reach.  In doing so, he knocked over his cup of water.  (Doc. 263-2).  It was never refilled or replaced.  (*See id.*).

At 8:59 p.m. on October 26, 2011, Devorsha Stewart, LPN recorded that Mr. Williams was "laying on floor partially covered by blanket, shaking, when asked if he was cold, inmate refused to answer."  (Doc. 263-23 at 0096).  Yet he reportedly – and unsurprisingly given over four days of apparent paralysis, accompanied by many hours of thirst and lack of food – admitted to depression.  (*Id.*). Although Williams had *repeatedly* announced, for over four days, to numerous Jail staff, that he was paralyzed, could not move, could not get up, and was thirsty, and

while he had not eaten, had water, or moved from the position to which he was dragged more than 36 hours before, Stewart recorded that she "encouraged [Williams] to inform staff of needs or concerns." (*Id.*).

### 4.    Mr. Williams's Death – October 27, 2011

The detention staff who delivered Williams's third and final food container during his last 50 plus hours at the Jail did not bother to open the cell door. The video shows an arm reach through the cuffing port of the cell door at about 5:10 a.m. on October 27, 2011 and drop the container at Williams's feet. (Doc. 263-2). A note entered by mental health team member John Bell at 8:36 a.m. that morning reported that Williams was "laying on floor with some spittle on cheek," that Williams stated "I want my phone, Iwant [sic] my phone," but his speech was unclear and mumbled and his memory, "insight / judgment / impulse control" were "poor." (Doc. 263-23 at 0096). At about 8:40 a.m., Bell entered the cell with Dr. Khadga Limbu, a resident in family medicine who was "shadowing" Bell, and LPN Carmen Luca. For the first time on the video, staff took turns running an instrument across the bottoms of Mr. Williams's feet. Luca indicated that she first ran her pen across the bottoms of his feet, and there was no response, but there was a little response when Dr. Limbu did it. (Doc. 263-10 at 3112).

Williams's state and lack of responsiveness concerned Dr. Limbu, John Bell, and Nurse Luca, and they informed Phillip Washburn, M.D., the Jail's Medical Director, that Williams needed medical attention. (Doc. 263-10 at 3073, 3117-18; Doc. 263-30 at 116-118). Nurse Luca indicated that they had a discussion about "maybe he should be going to the hospital and have a more serious check" and that Dr. Washburn was subsequently involved in a discussion about sending Williams to the hospital. (Doc. 263-10 at 3071, 3112). That morning, John Bell spoke with Tammy Harrington, RN, the Director of Nursing, about Mr. Williams because "Bell was

very concerned that Mr. Williams'[s] physical condition was worsening." (Doc. 263-32 at 8, ¶ 23). Harrington directed Bell to immediately have Dr. Washburn assess Mr. Williams and, after Williams was subsequently found unresponsive in his cell, Bell confirmed to Harrington that he had asked Washburn to assess Williams. (*Id.*). When interviewed later, Dr. Washburn "d[id] not remember" being so informed by Bell or Limbu, and he never checked on Williams. (Doc. 263-10 at 3120-21). Washburn testified that, "[i]f it happened it was my bad. Because if a resident Doctor would have said that he needed to be sent out [to the hospital] I would have sent him right out." (*Id.* at 3121).[10]

At just after 11:00 a.m. on October 27, Williams was found unresponsive, more than five days after (1) being detained for a misdemeanor for which he was never even arraigned and (2) reporting a broken neck and paralysis, which he reported to numerous Jail staff.[11] After unhurried attempts at CPR, it was clear that Williams, who was lifeless and had blood coming from his mouth, was dead. (*See* Doc. 263-2; Doc. 263-12 at 0043). The Medical Examiner determined that Mr. Williams died from "complications of vertebrospinal injuries due to blunt force trauma." (Doc. 263-33 at 9). The post-mortem examination also included a "vitreous electrolyte analysis which showed a dehydration pattern." (*Id.*). Plaintiff's expert, Dr. Khan, has opined that the Jail's failure to stabilize Williams's cervical spine resulted in a hematoma traveling up the spine, shutting down the spinal cord, which caused Williams's respiratory

---

[10]   Although he denied being informed that Williams needed medical attention, Dr. Washburn's testimony suggests that he *had* previously been informed that Williams exhibited paralysis. (*See* Doc. 263-31 at 70 ["Dr. Harnish evaluated him, I believe, and said it was psychosomatic paralysis, I didn't think I needed to go any further with it."]). But he never saw Williams before he was found unresponsive.

[11]  Mr. Williams was taken to the Tulsa County Jail in the early morning hours of Saturday, October 22, 2011, and he died on Thursday morning, October 27, 2011. While charges were filed on the date of his death, it is unclear whether they were filed while he was even alive. In any event, it appears that bail was never set, and Williams was not arraigned before he died.

muscles to stop working, thereby causing his death.  (Doc. 263-34 at 12).[12]  According to Dr. Khan, had the Jail stabilized Mr. Williams's cervical spine and referred him to an appropriate medical facility, his death would have been avoided and it is "probable that he would be ambulatory today."  (*Id.*).  Yet, in Dr. Washburn's view, Williams "received appropriate care while he was housed on the medical unit at the jail," and "[p]eople just die sometimes."  (Doc. 263-31 at 70-71).

Michelle Robinette was the Detention Chief Deputy at the time that Mr. Williams was at the Jail in October, 2011.  She watched the 50 hours of video of Williams in Medical Cell 1.  She testified as to her observations from the video, agreeing that Williams was not properly fed or provided appropriate hydration and stating in part as follows:

> He was given a styrofoam cup of water placed at his shoulder that he never drank that was kicked over by a doctor and never replaced - - or a nurse.  I can't remember which.  He was fed with styrofoam trays which is normal.  They were either placed inside the bean hole or put on the floor in front of the door.  And no time during that video did I see him go to them and eat any of the food out of them.  None of my detention officers took the time to open the door to verify that he was eating or assist him any.

(Doc. 263-1 at 172).  Robinette considered the treatment of Mr. Williams "inhumane [and a] lack of human decency."  (*See id.* at 194; *see also id.* at 247-248).

### D.    Policies / Practices at the Tulsa County Jail

The Tulsa County Sheriff is responsible for the health and safety of Jail inmates, as well as for inmate healthcare.  (*See* Doc. 263-39 at 14; Doc. 263-22 at 38).  Plaintiff alleges that the former Sheriff, Stanley Glanz, was deliberately indifferent to serious medical and mental health

---

[12]    Mr. Glanz argues that Dr. Khan's report is inadmissible.  However, his report contains a declaration under penalty of perjury and may thus be considered under Fed. R. Civ. P. 56(c).  *See* Fed. R. Civ. P. 56(c) (permitting reliance upon declarations); *id.*, 2010 Advisory Comm. Notes ("A formal affidavit is no longer required. 28 U.S.C. § 1746 allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit.").

needs of Jail inmates, that the indifference dates back to 2005 when he took over the operation of the Jail, that Glanz was responsible for systemic deficiencies in the medical and mental health care practices at the Jail, and that such deficiencies led to Mr. Williams's death.

The National Commission on Correctional Health Care (NCCHC) conducted an on-site audit of the Jail's medical services program in 2007.  (Doc. 263-40; 263-42; 263-43). According to Elandia Diane Maloy, the Jail's supervisor over medical records during the 2007 NCCHC audit, then-Sheriff Glanz and Tim Albin, who was a TCSO official at the time, conducted a pre-audit meeting with department supervisors to emphasize the importance of passing the audit. (Doc. 263-41 at 117-118, 123).  At the meeting, Glanz allegedly said that "heads were going to roll" if the audit did not go well (*id.* at 123), and Glanz and Albin purportedly conveyed that medical staff should hide from the NCCHC auditors any problem medical charts:

> Q.      But your testimony is that certain files had been pulled and wouldn't even be available for [the auditors] to review; is that what you're telling us?
>
> A.      Yes. . . .  (*Id.* at 187). [13]
>
> Q.      And you participated in pulling these files to put in the milk crate to hide from the auditors, correct?
>
> A.      It was three ladies in there, so we all did, yes. . . .
>
> Q.      You're not saying [Pam Hoisington, the Health Services Administrator at the Jail] did that at the direction of Tim Albin, are you?
>
> A.      *We were told that, if it was a problem chart, that the auditors better not see those.*
>
> Q.      (By Mr. Fortney)  Hold on. Pam Hoisington told you that?
>
> A.      *It came from Chief Albin and Sheriff Glanz.*

---

[13]  Maloy testified that over 20 medical files were "pulled" in this manner so that they would be unavailable to auditors. She also asserted that inmates were moved around the Jail, and even moved off premises, so that they would not be available to auditors. (Doc. 263-41 at 188-189).

> Q.     *How were you communicated that from them?*
>
> A.     *When we had the first meeting, it is discussed what charts were going to be placed for the auditors to see. . . . So it was told in that meeting that they didn't want them to see certain inmates. . . .*
>
> Q.     *You're telling me that - - who said this?  Albin or Glanz, or who said this?*
>
> A.     *This came from Albin.*
>
> Q.     *Your testimony under oath today is that Tim Albin told you all in a meeting to hide charts?*
>
> A.     *Yes. . . . He said that he did not want the problem charts to be seen by the auditors, and he did not want the problem inmates to be seen by the auditors.*

(Doc. 263-41 at 188-190) (emphasis added).

Maloy also testified that, in the process of the NCCHC audit, Pam Hoisington asked Maloy to falsify medical charts and indicated that "[s]he wanted every chart to be kind of altered if there was something in there bad or if there were sick calls in the charts that were not addressed."  (*Id.* at 119).  Thus, Hoisington directed them to create false files that would be provided to NCCHC, and to select for review by NCCHC only charts of inmates who did not have "a lot of medical issues" and who were "fit."  (*Id.* at 119-120).  They called them "dummy charts."  (*Id.*).  TCSO staff also attempted to steer the auditors to the preselected or dummy charts that were collected in baskets from which they wanted the auditors to choose.  (*Id.*).

Despite the alleged hiding of certain problematic charts and attempt to steer NCCHC to the dummy charts, the NCCHC issued a preliminary report in early 2007, noting problems to be addressed by an action plan.  (*See* Doc. 263-42).  Those problems included the following:

Medical staffing shortages with increased workloads, which resulted in numerous problems.  (*Id.* at 2, 3, 4, 9, 10);

Medical staff's insufficient education and knowledge with respect to screenings, diagnostic machines, mental health treatment plans, medication administration, and problem lists.  (*Id.* at 5, 6, 7, 8, 9);

Mental health treatment plans were not complete due to a lack of proper charting procedure.  (*Id.* at 7-8);

There was a failure at the Jail to timely triage sick calls, and inmates were not seen by a qualified health care professional within 24 hours, due to staff shortage with increased workloads.  (*Id.* at 9); and

The "follow up of inmates with mental health needs is not of sufficient frequency to meet their needs.  Once mental health issues were identified: 1, there was no consistent follow up by the mental health staff; 2, not everyone taking psychotropic medications had been scheduled for a follow-up evaluation; and 3, there was a noted delay in responding to routine mental health-related requests submitted by the inmates."  (*See* Doc. 263-40 at 62:4-17).

According to Maloy, the defects noted in the 2007 NCCHC audit were never addressed at the Jail, and medical care practices did not change.  (Doc. 263-41 at 123-124).  Although Hoisington drafted some action plans in response to the 2007 audit, they were never implemented.  (*Id.*).  At deposition, Mr. Glanz could not identify any changes to policies or practices at the Jail following the 2007 NCCHC audit and did not know whether any changes had been made.  (Doc. 263-39 at 162-163).

NCCHC conducted another audit of the Jail's medical system in 2010.  After that audit, NCCHC placed TSCO on probation, after finding several serious deficiencies.  (Doc. 263-48).  The NCCHC's November 12, 2010 report noted significant concerns, including the following:

The Jail was performing insufficient continuing quality improvement reviews in that the quality improvement committee "does not identify problems, implement and monitor corrective action, nor study its effectiveness."  (*Id.* at 0075).  The NCCHC report also indicated that the responsible physician should be involved in the quality improvement process.  (*Id.*).

The Jail had not met the standard for procedures in the event of inmate death.  (*Id.* at 0076).  There had been several inmate deaths at the Jail in 2010, the clinical mortality reviews – which are assessments of clinical care provided and the circumstances leading up to death – were poorly performed, and the Jail

conducted no death review as to a June 2010 "natural causes" death. (*Id.*). The purpose of the assessments "is to identify areas of patient care or system policies and procedures that can be improved." (*Id.*).

The Jail had not met the standard for Hospital and Specialty Care, which required the Jail to arrange for inpatient medical and specialized medical outpatient care, by written agreement or understanding. (*Id.* at 0079). The "standard intends that inmates have access to necessary hospitalization and specialty services and that the [responsible health authority] anticipates and resolves problems in advance of the delivery of specialty care in order to ensure continuity." (*Id.*).

The responsible physician was not documenting review of nurses' health assessments. (*Id.* at 0080).

The Jail was not in compliance with the non-emergency health care requests standard, which required that requests for health care should be received daily by qualified health care professionals and triaged within 24 hours. (*Id*. at 0082).

Several corrective actions were required in order for the Jail to meet the standard for continuity of care during incarceration. (*Id.* at 0083). The NCCHC report noted that specialty consultations are not completed in a timely manner and are not ordered by the physician, individual treatment plans were limited and did not contain information such as the frequency of follow-up for medical evaluation, adjustment of treatment modality, the type and frequency of diagnostic testing, or the type and frequency of therapeutic regimens. (*Id.*).

"The responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff." (*Id.*).

To comply with the continuity of care standard, corrective action was required with respect to individual treatment plans, which would have to "include, at a minimum, the frequency of follow-up for medical evaluation and adjustment of treatment modality; the type and frequency of diagnostic testing and therapeutic regimens; and when appropriate, instructions about diet, exercise, adaptation to the correctional environment, and medication." (*Id.*). In addition, "[t]he physician's clinical chart reviews should be of sufficient number and frequency to assure that clinically appropriate care is ordered and implemented." (*Id.* at 0084).

The Jail was not in compliance with the standard for patients with special needs, in that "[i]ndividual treatment plans (ITP) are not developed by the responsible physician; but other qualified clinicians do complete ITPs at the time the condition is identified. The ITPs are not updated when warranted for frequency of follow-up for medical evaluation, or the frequency of follow-up for adjustment of treatment modality." (*Id.* at 0085).

The infirmary care standard was not met in that "admission to and discharge from infirmary care are not documented by the responsible physician." (*Id.* at 0086).

Mr. Glanz testified that he would have received the 2010 NCCHC report and that, with respect to such reports, he would "read the first two or three pages, and then . . . file them." (Doc. 263-39 at 140:16 – 141:8).  At the time of Mr. Williams's death, Tammy Harrington, R.N., was the Jail's Director of Nursing.  Before holding that position, she worked as a sick call nurse from August 2008 through June 2011 and in the infirmary from October 2007 through August 2008.  (Doc. 263-32 at 1, ¶ 4).  During her years at the Jail, she observed that the Jail's medical directors "repeatedly failed to provide adequate care for inmates, or supervision for the nursing staff," which "created real and substantial risks to inmate health and safety, and at times, resulted in catastrophic medical outcomes." (*Id.* at 2, ¶ 5).  Harrington and all other nursing staff assisted in gathering documentation in connection with the 2010 NCCHC audit of the Jail's medical program.  During that process, Hoisington directed her and other nurses to find records of medical care that complied with NCCHC standards.  According to Harrington, "the records and care provided at the Jail were so deficient that it would take up to eight hours every week just to find compliant charts." (*Id.* at 3, ¶ 7).

Harrington also asserts that she was asked to "doctor medical charts by backdating undocumented information," but she refused.  However, medical records staff assisted with locating and compiling charts to be removed, and Harrington at one point saw medical charts being carried out of the Jail.  (*Id.*, ¶ 8).  Although the medical program at the Jail "failed" the 2010 NCCHC audit, Harrington could "not recall any significant changes in medical or mental health policy or practice at the Jail after the 2010 NCCHC audit results were released." (*Id.*, ¶ 9).

In 2011, just months before Williams died, the United States Immigration and Customs Enforcement (ICE) and Department of Homeland Security Office of Civil Rights and Civil

Liberties (CRCL) audited the Jail.  (Doc. 263-3; Doc. 263-32 at ¶ 20).  On September 29, 2011, the CRCL provided the TCSO a written summary of audit findings, including the following:

> The "CRCL found a *prevailing attitude among clinic staff of indifference*" (Doc. 263-3 at ¶ 1) (emphasis added);
>
> "Doctors having to wait to see inmates due to lack of escorts" (*Id.* at ¶ 4);
>
> "Nurses are undertrained [and are] not documenting or evaluating patients properly" (*Id.* at ¶ 7).
>
> "[O]ne case clearly demonstrate[d] lack of training, perforated appendix due to lack of training and supervision" (*Id.*);
>
> "[T]wo ICE detainees with clear mental/medical problems . . . have not seen a doctor" (*Id.* at ¶ 8); and
>
> "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years.'"  (*Id.* at ¶ 9).

Glanz testified that he believed that the CRCL audit in 2011 was based upon complaints from Catholic Charities, a Tulsa non-profit entity.  (Doc. 263-39 at 153).  Glanz received a copy of the summary from the CRCL audit closeout (Doc. 263-3), and he discussed it with TCSO official Brian Edwards.  (Doc. 263-39 at 153).  However, Glanz was unable to identify what, if any, practices or policies were changed in response to the serious concerns noted by CRCL.  (*See id.* at 162-163).  According to Harrington, after the CRCL audit results were released, there was no concern about "actually . . . improv[ing] the medical and mental health care provided to inmates at the Jail"; the only concern was maintaining the federal government's $6,000,000 contract with the Jail for the housing of ICE inmates. (Doc. 263-32 at 8, ¶ 22).

Harrington asserts that the CRCL medical auditor also found that a particular nurse, Sara Jeffries, had repeatedly failed to provide timely care to inmates.  (*Id.* at 7, ¶ 20).  Harrington believed that "the dangerous conditions at the Jail would never improve unless and until those providing substandard care were held accountable" and that Jeffries should be "written up" for

her "substandard care." (*Id.* at 7, ¶ 20). However, the Jail's Health Services Administrator at the time, Chris Rogers, tore up Harrington's write up of Jeffries and refused to hold Jeffries accountable. (*Id.* at 7-8, ¶ 20). Harrington alleges that the "poor care was simply accepted by [the TCSO and its health care contractor] as standard." (*Id.* at 8, ¶ 21).

Harrington also asserts that a serious lack of medical supervision "created an atmosphere of chaos and fostered indifference to inmate medical and mental health needs." (*Id.* at 11, ¶ 30). There were severe staffing shortages, "[i]nmates in need of urgent or emergent medical assistance for injuries, illness, or mental health issues were not seen for days - - and sometimes weeks - - due to the Jail's practices relating to triage", and "[t]here was no one at the Jail who actually evaluated and prioritized the sick call complaints in a timely manner" (*id.* at ¶ 14). The TCSO "impeded the ability of clinical staff to care for inmates with serious needs by maintaining power over hospital referrals and EMSA." (*Id.* at ¶ 31). Nursing staff were "routinely directed . . . to falsify, doctor and backdate medical records and charts." (*Id.* at 7, ¶ 19).

Despite serious medical deficiencies cited in the 2007 and 2010 NCCHC audit reports and the CRCL's 2011 report of a clear lack of training and supervision and a prevailing attitude of indifference among medical unit staff, then-Sheriff Glanz continued to renew the contract with the Jail's health services contractor, and in 2012, just one year after Mr. Williams's death, Glanz testified that he would rate the medical staff performance as a 9 on a scale of 1 to 10, with 10 being the best. (Doc. 263-39 at 17). Plaintiff asserts that this is further evidence that, regardless of obvious, continuing, systemic, and dangerous deficiencies in the Jail's medical and mental health system, which placed inmates like Williams at serious risk of harm, Glanz and the TCSO were deliberately indifferent to the serious problems repeatedly identified in the various audits prior to Mr. Williams's death, and they did nothing to alleviate the serious risk to Jail inmates.

The Tenth Circuit in *Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015) did not mention the NCCHC or CRCL audits, Glanz's alleged participation in ordering Jail staff to hide problem medical records, or any other of the specific evidence of Glanz's knowledge of systemic medical care deficiencies placing inmates at substantial risk of serious harm, which were fully set forth in this Court's summary judgment opinion in that case. *See Cox v. Glanz*, 11-CV-457-JED, 2014 WL 903101 at **7-14 (N.D. Okla. Mar. 7, 2014), *rev'd*, 800 F.3d 1231.[14] The Circuit's decision not to summarize or mention that specific evidence in *Cox* makes some sense in light of its legal conclusion that Glanz could not be found to have acted with deliberate indifference absent proof that he had a "particularized state of mind" and "knowledge that *the specific inmate* at issue presented a substantial risk of suicide." *See Cox*, 800 F.3d at 1250. Under that standard, even significant, convincing evidence of an official's knowledge of a dangerously deficient system would be irrelevant, so long as the official was unaware of the precise risk to the specific inmate.

If *Cox*'s "specific inmate" standard were applied in the context of a complete denial of medical care to an inmate, an official in charge of prison operations could not be held liable absent proof that he had particularized knowledge about the condition of the *specific inmate*, even where the evidence showed that the official intentionally continued to operate the prison with a dangerously deficient medical care system (or no medical care), while knowing that the lack of care placed inmates at substantial risk of death, and with knowledge that the lack of care had in fact caused serious harm to inmates in the past. That is not consistent with the law

---

[14]   The Circuit's opinion in *Cox* did reference the plaintiff's allegation of "undertrained and unsupervised" staff and her "strong assertions regarding systemic failings," but did not mention the record *evidence* which, taken as true at the summary judgment stage, would show that (1) Glanz participated in a meeting at which Jail staff were instructed to hide problem medical charts from auditors and (2) he was advised in writing of serious deficiencies in the medical unit, including a prevailing attitude of indifference among clinic staff and a failure to provide timely and adequate medical care to inmates. *See Cox*, 800 F.3d at 1240 (citing argument in plaintiff's response); *id.* at 1254 (referencing plaintiff's "strong assertions").

announced by the Supreme Court or other Tenth Circuit opinions outside of the suicide context. To be clear and as will be discussed *infra*, *Cox's* inmate-specific state of mind requirement does not apply here. Thus, the body of evidence from which a jury could find that Glanz was aware of dangerous deficiencies in the Jail's medical care and his failure to take remedial action is of critical import in evaluating the plaintiff's claims against Glanz, as well as against the County.

## IV.    Law Governing Claims of a Denial of Medical Care

### A.    Constitutional Right to Medical Care in Pretrial Detention

The Eighth Amendment "imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). As noted, Mr. Williams had not been convicted (or even arraigned on any charges) at the time of his death. "Under the Fourteenth Amendment due process clause, 'pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985)).

Prisons must "make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates." *Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980) (quoting *Battle v. Anderson*, 376 F. Supp. 402, 424 (E.D. Okla. 1974)). Claims based upon a failure of prison officials to provide medical care for serious medical needs of inmates are judged under the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97 (1976). As explained by the Supreme Court in *Estelle*:

> The [Eighth] Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal measures. . . .

These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," . . . the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

429 U.S. at 102-05 (internal citations and footnotes omitted).

"Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ramos*, 639 F.2d at 575. Deliberate indifference has both objective and subjective components. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991). The objective component is met if the harm suffered is sufficiently serious. *Id.* at 298. The subjective component requires an inquiry into the state actor's culpability. *See Mata v. Saiz*, 427 F.3d 751, 753 (10th Cir. 2005).

B.     The Qualified Immunity Framework

Each of the individual defendants has asserted a qualified immunity defense. In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. *Tolan*, 134 S. Ct. at 1865. The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated

a [federal] right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008). The second prong asks "whether the [federal] right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Government officials are "shielded from liability . . . if their actions did not violate clearly established" federal rights "of which a reasonable person would have known." *Id.* (quoting *Hope*, 536 U.S. at 739) (internal quotation marks omitted). "'[T]he salient question . . . is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Id.* (quoting *Hope*, 536 U.S. at 741).

While the courts are "not to define clearly established law at a high level of generality," "a case directly on point" is not required so long as "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011); *see also Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (quoting *al-Kidd*, 563 U.S. at 741). Thus, a plaintiff is not required to show that "the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Pauly v. White*, 814 F.3d 1060, 1075 (10th Cir. 2016) (quoting *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) and *Cruz v. City of Laramie*, 239 F.3d 1183, 1187 (10th Cir. 2001)).

Indeed, the Supreme Court has held that "materially similar" or "fundamentally similar" precedents are *not* required to satisfy the "clearly established law" prong:

> Despite their participation in this constitutionally impermissible conduct, respondents may nevertheless be shielded from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In assessing whether the Eighth Amendment violation here met the *Harlow* test, the Court of Appeals required that the facts of previous cases be "'materially similar' to Hope's situation." 240

F.3d at 981. *This rigid gloss on the qualified immunity standard, though supported by Circuit precedent, is not consistent with our cases. . . .*

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful*, see *Mitchell* [v. *Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). . . .

[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in [*United States v. Lanier,* 520 U.S. 259 (1997)], we expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts.

*Hope*, 536 U.S. at 739-41 (emphasis added).[15]

"The *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts *toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional*." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (emphasis added); *see also Pauly*, 814 F.3d at 1075. The Tenth Circuit has "adopted a sliding scale to determine when law is clearly established." *Pauly*, 814 F.3d at 1075 (citing *Casey*, 509 F.3d at 1284). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (quoting *Casey*, 509 F.3d at 1284).

---

[15] The Supreme Court in *Hope* determined that prison guards were not entitled to qualified immunity in a suit where the plaintiff claimed that his Eighth and Fourteenth Amendment rights were violated when he was twice handcuffed to a hitching post, one of which lasted for seven hours, while he was shirtless in the sun, had water only once or twice, was taunted by a guard about the lack of water, and was given no bathroom breaks. *See* 536 U.S. at 733-734.

Years before Mr. Williams was in the Jail in 2011, the law was clearly established that a prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *Estelle*, 429 U.S. at 104; *Lopez v. LeMaster*, 172 F.3d 756, 764 (10th Cir. 1999). It was also clearly settled law by no later than 2005 that a delay in medical care constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm. *Mata*, 427 F.3d at 751. The "substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

It was also clearly established that "when the pain experienced during [a] delay [in medical care] is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test.'" *Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)). Numerous types of ailments and pain have been considered sufficiently serious medical conditions within the *Estelle* framework, even though the precise circumstances of each case are not identical. *See Lopez*, 172 F.3d at 764 (contusions and severe strains); *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (chest pains); *Mata*, 427 F.3d at 752-54 (severe pain and worsening of heart condition); *Kikumura*, 461 F.3d at 1292-93 (severe pains, cramps, vomiting due to hyponatremia).

In *Al-Turki v. Robinson*, 762 F.3d 1188, 1193-94 (10th Cir. 2014), the court concluded that "several hours of untreated severe pain . . . would fall on the actionable side of the line." 762 F.3d at 1194. In so finding, the court stated, "[i]t has been clearly established in this circuit since at least 2006 that a deliberate indifference claim will arise when 'a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency. . . .'" *Id.* (quoting *Self*, 439 F.3d at 1232).

V.      **Violation of Mr. Williams's Constitutional Rights**

A.      **Objective Component**

It is abundantly clear that the harm ultimately suffered by Mr. Williams meets the objective component of the Eighth Amendment deliberate indifference test. The defendants in this case do not challenge that Williams's condition was sufficiently serious. (*See* Doc. 224 at 19 of 37 ["there is no dispute that Mr. Williams' medical condition was serious; he ultimately and unfortunately died at the jail"]). Death is, "'without doubt, sufficiently serious to meet the objective component.'" *Martinez*, 563 F.3d at 1082, 1088-89; *see also Cox*, 800 F.3d at 1240-41, n.3. In addition, the evidence in this case would reasonably support a finding that Mr. Williams suffered substantial pain, which would independently qualify as sufficiently serious to meet the objective standard.

B.      **Subjective Component**

The subjective component of the deliberate indifference test is met if a prison official knows of and disregards an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Mata*, 427 F.3d at 752. "To prevail on the subjective component, the prisoner must show that the defendant[] knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Martinez*, 563 F.3d at 1089 (quoting *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006)). This standard requires consciousness of a risk, which is a subjective standard that must be applied to prison officials on Eighth Amendment claims. *Farmer*, 511 U.S. at 840.[16]

---

[16]   While a subjective standard applies to prison condition claims against an individual official, an objective standard applies to claims against municipalities, because "considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official." *Farmer*, 511 U.S. at 841-42; *see Barney v. Pulsipher*, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998.

"[A] jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition."  *Tafoya*, 516 F.3d at 916 (quoting *Farmer*, 511 U.S. at 842); *see also Estate of Booker v. Gomez*, 745 F.3d 405, 429-430 (10th Cir. 2014) (applying *Farmer* to pretrial detainee's claim of a denial of medical care).  In *Farmer*, the Supreme Court analyzed the subjective standard under the Eighth Amendment as follows:

> Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. . . . Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. For example, *if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."*
>
> *Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk. . . .*

*Id.* at 842-45 (emphasis added).

With these subjective deliberate indifference standards outlined, a discussion of the evidence with respect to the conduct of each of the defendants is necessary.  Hence, the role of each defendant with respect to the delay or denial of medical care is addressed below.

### 1.      The OPD Officers

Plaintiff's claims against the OPD Officers, Tracy Townsend, Jack Wells, H.D. Pitt, and Lem Mutii, are based upon her allegations that all of the defendants "knew . . . that Mr. Williams was in danger of serious personal harm and that he would try to harm himself and/or had suffered serious head or neck injuries" and that they "disregarded the known and obvious risks to [his] health and safety."  (Doc. 15 at ¶¶ 67-68).  Plaintiff also asserts that all of the defendants failed to provide "an adequate or timely mental health evaluation, any assessment, including MRI or CT scan, of Mr. Williams'[s] probable head trauma and/or neck injury, proper classification and segregation of Mr. Williams as being mentally ill, timely or adequate mental health and/or medical treatment and/or adequate monitoring and supervision for Mr. Williams while he was placed under their care, in deliberate indifference to Mr. Williams'[s] serious medical needs, health and safety."  (*Id.* at ¶ 69).

### a.      Lem Mutii

Officer Mutii was the least involved of any of the OPD officers.  That he is a bit player is demonstrated by the lack of effort either side put into the briefing on his motion.[17]  Mutii argues that he "had no involvement in the prior decision to arrest Elliott Williams and was in Williams [sic] presence for less than five minutes."  (Doc. 221 at 9).  In response, the plaintiff argues that, in those five minutes, "Williams exhibited conspicuous signs of severe mental illness and presented a willingness to harm himself."  (Doc. 272 at 10).  Mutii's involvement appears to have been extremely limited to coaxing Mr. Williams out from under the bunk at the Owasso

---

[17]   For example, defense counsel notes that the plaintiff's recycled brief never mentions Mutii by name in its statement of facts, and then points out one of the Response's headings, which reads "Townsend" where it should say "Mutii."  (Doc. 283 at 2).  For his part, defense counsel begins *his* largely recycled summary judgment motion with the following: "COMES NOW the Defendant, Lem Mutii, (hereinafter, 'Defendant Townsend')."  (Doc. 221 at 1).

Jail.  He was not involved in any of the following: Williams's arrest; his transport to the Tulsa County Jail; the take down at the Tulsa County Jail; any decisions regarding where to take Williams or what medical or mental health care he would receive; or any contact with Williams at the Tulsa County Jail.  As a result, Mutii's limited participation in the alleged deprivation of Williams's constitutional right to medical and mental health treatment does not rise to the level necessary to hold him liable.  In short, there is no evidence of Mutii's consciousness of risk – that he knew that Williams faced a substantial risk of harm and disregarded such risk, and the evidence thus does not support a finding of a constitutional violation by Officer Mutii. He is thus entitled to qualified immunity, and his Motion for Summary Judgment (Doc. 221) is **granted**.

### b.       Officer Wells, Sergeant Pitt and Captain Townsend

Officer Wells was involved in the interactions with Mr. Williams at the Owasso hotel, his arrest, his incarceration at the Owasso Jail, his transport to the Tulsa County Jail, the take down at the Jail, and the transfer of Williams into the custody of the TCSO at the Jail.  Wells fully briefed Pitt when Pitt arrived at the hotel, and Pitt signed off on Wells's report, which identified Williams as suicidal.  Pitt was also involved in the decision to cancel COPES, and he personally canceled COPES. Wells also briefed Townsend, who assisted in transporting Williams to the Tulsa County Jail, regarding the events leading to Williams's arrest.  (Doc. 271-4 at 133:16-18). Townsend then had an opportunity to observe Williams's state for himself and assisted in taking Williams to the floor of the Jail. (Docs. 269-7 at 4, 269-9, 269-13 at 45:14 – 46:20).

Viewing the facts in the light most favorable to the plaintiff, Sergeant Pitt, Captain Townsend, and Officer Wells each knew of Williams's unstable condition and that he was in need of mental health assistance.  Even before Williams ever expressed a desire to hurt himself, it was "readily apparent that [he] was having a mental breakdown" (Doc. 222-3 at 4), and it can

be inferred from the evidence that he advised both Pitt and Townsend of that fact.   Wells's

account included Williams's apparent suicide attempts and bizarre behavior.[18]   Townsend then

witnessed Williams's state firsthand, and wrestled with him in the Jail.   Wells witnessed the full

panoply of Williams's disturbing behavior.   Each officer had more than enough information,

"even [as] a lay person[,] . . . [to] easily recognize the necessity of" mental health assistance.

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

While the record supports an inference that these officers knew of a risk to Williams

based on his mental breakdown and expression of suicidal thoughts, the record does *not* contain

any evidence that they were deliberately indifferent to such a risk.   Before the true extent of

Williams's state became apparent, the officers attempted to get help for Williams by calling

COPES.   Once Williams became uncooperative and moved toward the officers in an attempt to

provoke them, Wells and Pitt decided to cancel COPES and not to seek assistance from TCBH,

because Wells believed, incorrectly, that neither organization would accept Williams given his

state. (Doc. 222-1 at 101-03; 105).    Wells knew that the Jail employed mental health

professionals, and he so informed Pitt.  (*Id.* at 102:12-19).

---

[18]   Wells's summary judgment motion waffles on this issue, stating that while "Wells recognized a psychological medical need," he indicated in intake paperwork that Williams was suicidal only out of "an abundance of caution" and "based solely on [the fact that Williams] . . . had allegedly told his wife earlier in the day that he was suicidal.  No other behavior from the time Defendant Wells arrived at the hotel to the time that he filled out the intake screening from [sic] indicated to him that . . . Williams was suicidal."  (Doc. 222 at 16-17 (citations omitted); *see also id.* at 19 ("[W]ith regard to any suicidal tendencies, Elliott Williams made no overt act to indicate that he was going to harm himself or others.  Elliot Williams in fact denied that he was suicidal.")).  The claim that Williams did not evince a desire to harm himself, either verbally or through "overt act[s]," is inconsistent with the record.  Williams denied being suicidal before his encounter with the police went "south and sideways" (Doc. 222 at 73) and Williams began, for example, to ask the officers to shoot him.

Wells may have been incorrect in his belief that adequate mental health services were available to Williams at the Jail and nowhere else, but that mistake does not establish deliberate indifference.  Indeed, Wells's belief that the Jail would provide Mr. Williams with the care that he needed was consistent with the opinions expressed by Mr. Williams's father, Earl, who repeatedly requested that the OPD officers take Elliott Williams to Jail that night, believing it to be the "safest place" for him.  (*See* Doc. 222-6 at 34:20-37:40).   When Earl Williams was advised by Wells that Elliott Williams was going to jail that night, Earl responded "that's good, that's good" (*id.* at 37:15), and Wells said they were going to "get [Elliott Williams] the help he's got to get" (*id.* at 37:40).   Booking Williams into the Jail, Wells provided his written account of Williams's state, including that Williams was suicidal, although Wells did not recall passing that information along verbally.  In light of these facts, the officers cannot be said to have deliberately disregarded an excessive risk to Williams's safety by delivering him to the only place they believed would accept him and provide appropriate care for him, even though the officers were mistaken in both beliefs.

The record is also devoid of any evidence of direct causation.  The plaintiff has not identified any evidence supporting an inference that the OPD officers had any reason to predict the "inhumane [treatment]" or "lack of human decency" that would be shown to Williams by Jail staff after Williams was transferred into the Jail's custody and care. (*See* Doc. 263-1 at 194, 247-248).  The OPD officers' decision to cancel COPES and to take Mr. Williams to the Jail rather than some other facility did not directly cause him to suffer serious injuries to his cervical vertebrae and spinal cord, nor did those decisions directly cause his eventual death.  Ultimately Mr. Williams's suffering and death occurred after the OPD transferred custody of Williams to

the Jail, and there is a lack of evidence of a direct causal connection between the actions of the OPD officers and Mr. Williams's ultimate fate.

The OPD officers knew that the Jail ostensibly offered mental health services, and those officers cannot be held accountable for the Jail's actual practices or the treatment Mr. Williams ultimately received there. There is no evidence that Williams ever reported any neck injury before his custody was transferred to the TCSO at the Jail. In short, the plaintiff has not shown that Sergeant Pitt, Officer Wells, and Captain Townsend were deliberately indifferent to Williams's need for mental health care or that they were aware of, much less deliberately indifferent to, any serious medical need. As there is no evidence supporting a constitutional violation by those officers, "the qualified immunity inquiry comes to an end," *Mata*, 427 F.3d at 749, and those officers' summary judgment motions (Doc. 219, 220, 222) are **granted**.

## 2.    Jail Staff

In contrast to the OPD officers, there is significant evidence in this case from which a jury could find that Mr. Williams's due process rights under the Fourteenth Amendment were violated by Tulsa County Jail staff. [19] Numerous Jail staff – detention officers, their supervisors, nurses, and doctors – knew of Mr. Williams's condition, which obviously reflected an emergent need for medical attention and posed such obvious risks to his health, but he never received that medical attention. Booking staff at the Jail were aware that Mr. Williams had hit his head against the door to the booking cell, and they thereafter witnessed him on his back in the cell, asserting that he was paralyzed and unable to move, but he received no medical treatment.

---

[19]   While the individual Jail officials whose conduct is described in this order are not currently defendants in this action, their conduct is necessarily analyzed because evidence of a violation of Williams's constitutional rights is a necessary precondition to maintaining an official capacity claim against the current Sheriff or a supervisory liability claim against Glanz in his individual capacity. Those claims, and the additional legal requirements applicable to each, will be separately addressed below.

Numerous Jailers and medical staff knew that Williams claimed to be paralyzed, and they witnessed for themselves that he did not move or get up while in their care.  Despite Jail staff calling a "medical emergency," no medical care was provided for his injuries, and Williams was not evaluated by a physician to rule out a medical cause for his inability to move his legs.  (Doc. 263-10 at 3087).

Dr. Harnish denied Mr. Williams a medical evaluation and treatment even though Harnish had not ruled out a medical cause for the paralysis.  Dr. Washburn was informed that Williams was in immediate need of attention but did nothing, even when other Jail staff were obviously concerned and reported that Williams needed to go to a hospital.  Detention officers Steven Smith and Crystal Rich denied Nurse Hughes access to Williams after Hughes reported that she was concerned about his condition. For her part, Hughes gave up and did not bother to report her concerns about Williams's condition to her supervisors or the supervisors over Smith and Rich.  Countless Jail staff were concerned about Williams's condition, but despite those concerns, Williams was never provided a medical evaluation, and for several days no one called 911 or otherwise arranged for a transport to an outside physician or hospital.

The record construed in favor of plaintiff also contains abundant evidence that Mr. Williams's medical needs were so "obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Ramos*, 639 F.3d at 575; *see also Al-Turki*, 762 F.3d at 1192-93.  As noted, a jury may infer that a jail official had actual knowledge based on "circumstantial evidence, such as the obviousness of the condition." *Tafoya*, 516 F.3d at 916 (quoting *Farmer*, 511 U.S. at 842).  The obviousness of the condition is reflected by the video, which reflected that Williams did not move his legs, eat, drink, or get up to use a toilet for over 50 hours, as well as the fact that numerous lay people who encountered Williams were concerned about his

condition: (1) Detention Officer Taiwo Badidi was concerned after Williams could not get up and had an offensive smell (Doc. 263-10 at 3084); (2) After Williams was brought to the medical unit, Detention Officer Lois Bell was concerned because she "had never seen anyone come in like him . . . to not do a lot of moving . . . [or to not] get up to go to the bathroom" (*id.* at 3091); (3) Detention Officer Eddie White II became concerned for Williams on October 22 when Williams could not move and when Williams was rolled over and had "pooped" (*id.* at 3084); (4) Sergeant Carla Housley became concerned because Williams was unable to get up (*id.* at 3086); (5) Detention Officer Leticia Glover was concerned for Williams's well-being (*id.* at 3093), as she never saw Williams walk, stand or sit, he was always lying down, he was yelling out saying he could not feel his legs, and "throughout the night he was yelling" and, although Glover asked a nurse to "go down there and look at him," no nurse would (*id.* at 3093-3094); (6) After visiting Williams and finding he was "not very coherent," Chaplain Charles Bradshaw was concerned for Williams's wellbeing and reported his concern to Jail staff (*id.* at 3108-09); and (7) Inmate Carl Wiehe reported that he and Detention Officer Walsh saw Williams on Oct 23 "shivering very violently," Wiehe never saw Williams walk, Detention Officer Walker was concerned about Williams and would say "there's something wrong with this guy," and Walker told a nurse that there was something wrong with Williams and he "needed attention." (*id.* at 3133-3134).

The Jail's medical personnel were also concerned. Nurse Faye Taylor called a medical emergency when Williams was unable to get up and "was not acting in a normal behavior" (*id.* at 3086, 3087). Nurse Hughes was aware that Williams had head-butted the cell door, reported he could not move, that his neck hurt, and he was not moving his head much (*id.* at 3065), and when she saw Williams three days later, she did not recognize him, he did not look like the same person, and she was concerned (*id.* at 3083-3084). The mental health treatment team was

concerned about Williams on October 25 (*id.* at 3071, 3113) and asked Harnish to evaluate him. Harnish himself was concerned about Williams's claim that he could not physically function (*id.* at 3073, 3115).   Harnish was apparently concerned enough that he "*told [Williams] I was concerned that if he remained in this condition, when he was released from the jail, he might end up in a nursing home, if his mobilization didn't improve. . . . He didn't particularly like that idea, but I think he understood our concern.*" (*Id.* at 3113; *see also* 3114) (emphasis added).   Yet, Jail staff ignored these concerns, and Williams was never provided medical treatment, no one called for an ambulance or a transport to a hospital even after it was clear he was in serious danger, and he was not timely evaluated to determine the cause for his inability to rise from the floor.

A significant number of Jail staff were aware that Mr. Williams did not walk, stand, sit up, eat, or drink on his own for days.   Harnish himself was concerned about hydration, but instead of assisting or having someone assist Williams with drinking water, Harnish threatened to administer fluids by IV when Williams asked Harnish for a bucket with a tube of ice water to drink from (*id.* at 3072, 3113).   Mr. Williams reported serious pain; he consistently stated that he could not move or get up; monitored video showed that he did not move his legs and was unable on his own power to eat, drink, or use the toilet for over 50 hours; his speech was mumbled and at times incoherent; his skin was discolored as though there was a lack of oxygen; he was minimally responsive, or not responsive at all, to reflex tests on the bottom on his feet; he defecated on himself and subsequently had "stuff leaking out of [his] rectum"; he lay helpless in a shower for between one and over three hours, yelling "help me" at times; he could not drink or eat without being held up and assisted; and he had no food or water for more than two days.

From this evidence, a reasonable jury could find that Mr. Williams's medical needs were obvious to any layperson.   They could also find that the medical unit-wide attitude of inhumanity

and indifference shown to him, which resulted in the delay and denial of medical care in the face of his symptoms that were obviously indicative of a serious medical condition or medical emergency, amounted to deliberate indifference.  The evidence thus supports an inference that Jail staff knew that Williams faced a substantial risk of harm, and they were deliberately indifferent to that risk, violating Williams's due process rights to medical care.  *See Martinez*, 563 F.3d at 1089; *Callahan*, 471 F.3d at 1159; *see also Al-Turki*, 762 F.3d at 1194 (deliberate indifference arises where there is a complete denial of care in the face of "recognizable symptoms which potentially create a medical emergency. . . .") (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)); *Estelle*, 429 U.S. at 104-05.

### 3.    Stanley Glanz

Plaintiff's claim against former Sheriff Glanz, in his individual capacity, is based upon a supervisory liability theory.  Supervisory liability under § 1983 may not be premised upon a theory of respondeat superior.  *Booker*, 745 F.3d at 435 (citing *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013)).  "[M]ere negligence is insufficient to establish supervisory liability." *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999).  To succeed on a supervisory liability theory, a plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation."  *Booker*, 745 F.3d at 435 (quoting *Schneider*, 717 F.3d at 767).  To show that link, "three elements [are] required to establish a successful § 1983 claim against a defendant based upon his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind." *Schneider*, 717 F.3d at 767.

Although federal courts appear to uniformly agree that the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) imposes a stricter standard for the personal involvement required for supervisor liability, the Tenth Circuit has not yet determined the precise contours of

that standard.  *See Booker*, 745 F.3d at 435 (noting the contours of the requirement "are still somewhat unclear after *Iqbal* ... [but] [w]e need not define those contours here...."). In this Circuit, after *Iqbal*, "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution. . . ."  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010); s*ee Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013).

Here, based on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a policy or established practice of providing constitutionally deficient medical care in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.  *See Dodds*, 614 F.3d at 1199 (supervisor may be liable for the continued operation of a policy that causes subordinates to violate constitutional rights). Inferences could reasonably be drawn from the evidence that Glanz was notified, repeatedly, that the Jail's medical care system was dangerously deficient, placing inmates like Mr. Williams at substantial risk of serious harm, but that Glanz continued the operation of a policy of providing that dangerously deficient care.  In the months before Mr. Williams suffered and died without receiving any medical care, Glanz was made aware of the risks that the Jail's plainly deficient medical care, training, and supervision of Jail staff in the medical unit posed to detainees like Mr. Williams.  Glanz was also aware that an agency of the United States government had notified the TCSO, in writing, of its finding of "*a prevailing attitude among [Jail] clinic staff of indifference.*" (Doc. 263-3 at ¶ 1) (emphasis added).  He also knew of the CRCL's findings that

44

nurses were "undertrained [and are] not documenting or evaluating patients properly" (*id.* at ¶ 7), that such "clearly demonstrated lack of training" "and supervision" had resulted in an inmate suffering a perforated appendix (*id.*), and that inmates were not timely being seen by or provided access to Jail doctors (*id.* at ¶ 8).

A reasonable jury could also find that Glanz was notified of similar findings of serious problems in the 2007 and 2010 NCCHC audits, and took no action after notice in 2007, 2010, and 2011 to abate the risks posed to Jail inmates. (*See* Doc. 263-48 at 0075-0086). A reasonable inference could be drawn from the evidence that Glanz and Albin were well aware that the Jail's system of medical care was so deficient that they instructed that problem medical records be hidden so that the Jail's medical system might pass the NCCHC audits. (*See* evidence at pp. 20-21 *supra*). Harrington, the Director of Nursing at the time of Mr. Williams's death, provided a sworn affidavit that, during her years at the Jail, from October 2007 until March 2012, the Jail's medical directors "repeatedly failed to provide adequate care for inmates or supervision for the nursing staff," which "created real and substantial risks to inmate health and safety, and at times, resulted in catastrophic medical outcomes." Although the medical program at the Jail "failed" the 2010 NCCHC audit, there is evidence that there were no "significant changes in medical or mental health policy or practice at the Jail after the 2010 NCCHC audit results were released."[20]

From the foregoing evidence, a reasonable jury could find that Glanz was on notice of constitutional deficiencies in the care of detainees with serious medical needs and that his failure

---

[20] While Harrington did not state that Glanz was made aware of the serious risks posed by the medical care system between 2007 and 2011, a reasonable jury could infer such knowledge from the evidence, which includes: Maloy's sworn allegations that Glanz was in a meeting before the 2007 NCCHC audit, when Jail staff were directed to conceal medical records to pass the audit; the 2007 and 2010 NCCHC reports; and the 2011 CRCL findings. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a *question of fact* subject to demonstration in the usual ways, including inference from circumstantial evidence.").

to take appropriate measures to remedy these deficiencies constituted deliberate indifference to the serious medical needs of inmates like Mr. Williams.  The record also supports a finding of causation between Glanz's alleged deliberate failure to abate the known, serious risks to inmate health and the violation of Mr. Williams's constitutional right to receive medical care for his serious, emergent medical needs while at the Jail. The jury could also find that Glanz was on notice as to the problems with the Jail's medical care system, and that had he taken any number of possible remedial actions, Mr. Williams's condition would not have deteriorated and his death could have been avoided by timely medical intervention.  Accordingly, there are genuine issues of material fact as to the first prong of the qualified immunity analysis – whether there was a violation of Mr. Williams's rights under the Fourteenth Amendment, applying Eighth Amendment standards.  *See Layton v. Bd. of Comm'rs of Okla. County*, 512 F. App'x 861, 869-70 (10th Cir. 2013) (unpublished).[21]

Notwithstanding the foregoing evidence, Mr. Glanz argues that he may not be found individually liable because there is no evidence that he had "knowledge of the extent of Williams'[s] condition preceding his death" or that Glanz "knew that Elliott Williams was paralyzed."  (*See* Doc. 224 at 27 of 37).  Glanz was successful in asserting a similar, inmate-specific argument on appeal from the denial of summary judgment in a jail suicide case.  *See Cox*, 800 F.3d at 1249-50.  At least two judges in this District have previously explained why the Tenth Circuit's legal conclusion in *Cox* – that Glanz could not be found to have acted with deliberate indifference in the absence of proof that he had a "particularized state of mind" and "knowledge that *the specific inmate* at issue presented a substantial risk of suicide," *see Cox*, 800

---

[21]  "Unpublished decisions are not precedential, but may be cited for their persuasive value."  10th Cir. R. 32.1(A).  In light of the similarities between the evidence and issues here and those involved in *Layton*, the Court finds *Layton* to have persuasive value to the analysis in this case.

F.3d at 1250 – applies only in cases involving jail suicides.  *See Sanders v. Glanz*, 138 F. Supp. 3d 1248, 1263 (N.D. Okla. 2015); *Fisher v. Glanz*, No. 14-CV-TCK, 2016 WL 1175239, at *12 (N.D. Okla. Mar. 24, 2016); *Birdwell v. Glanz*, No. 15-CV-304-TCK, 2016 WL 2726929, at *7, n.3 (N.D. Okla. May 6, 2016).  While the Tenth Circuit does not apply the rule cited in *Farmer*, 511 U.S. at 842-44 or *Tafoya*, 516 F.3d at 916 in the jail suicide context, its opinion in *Cox* does not indicate that *Farmer / Tafoya* is inapplicable to any other inmate situation.  Accordingly, the discussion herein applies the deliberate indifference analysis of *Farmer* and *Tafoya*.

The Court's decision to employ the *Farmer / Tafoya* standard, rather than the particularized state of mind / inmate-specific standard applied in *Cox*, is further supported by the Tenth Circuit's decision in *Layton*, 512 F. App'x 861.  In *Layton*, a pretrial detainee died after the Oklahoma County Jail's healthcare provider, Correctional Healthcare Management of Oklahoma (the same healthcare provider in place at the Tulsa County Jail at the time of Mr. Williams's death), failed to take appropriate follow up actions to provide medical care to a detainee.  On appeal from the district court's grant of summary judgment to Oklahoma County and its sheriff, the Tenth Circuit reversed the summary judgment ruling and remanded the case after concluding that "a reasonable jury could find that Sheriff Whetsel and the County acted with deliberate indifference."  512 F. App'x at 863.

In determining whether there was an underlying constitutional violation in order to support a municipal liability claim against the County, the Tenth Circuit in *Layton* applied the *Farmer / Tafoya* standard and determined that the evidence presented fact issues which precluded summary judgment:

In *Tafoya,* we emphasized that "[t]he official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." *Id.* at 916; *accord Keith v. Koerner,* 707 F.3d 1185, 1188–89 (10th Cir. 2013); *see also Farmer,* 511 U.S. at

843, 114 S.Ct. 1970 (finding liability even though the prison official "did not know that *the complainant* was especially likely to be assaulted *by the specific prisoner* who eventually committed the assault" (emphases added)). Moreover, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk ... for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer,* 511 U.S. at 843, 114 S.Ct. 1970.

Here, Appellants submitted evidence that tends to demonstrate longstanding, systemic deficiencies in the medical care that the jail provided to detainees— specifically, that the detainees were not being seen for medical care in a timely manner, that medications were not being administered as directed, that follow-up care was not being provided to seriously ill detainees, and that the jail's design prevented effective monitoring and supervision of detainees with serious medical needs. . . .

Here, we conclude that Appellants have raised a triable issue of material fact regarding whether Sheriff Whetsel was aware of dangerous prison conditions that were substantially likely to result in constitutionally deficient medical care for seriously ill detainees. Furthermore, a reasonable jury also could infer that Mr. Holdstock's death was, in fact, caused by these dangerous conditions. Therefore, insofar as the district court found that Appellants could not survive summary judgment regarding the existence of a constitutional violation—the first step in the municipal liability analysis—we conclude that the court erred.

*Layton*, 512 F. App'x at 869-70.[22]

In light of the foregoing, this Court must reject Glanz's argument that he cannot be held liable without having had direct, personal contact with Mr. Williams or knowledge of his particular medical condition. Instead, as the Tenth Circuit determined in *Layton*, the *Farmer / Tafoya* standard is applicable. As in *Layton*, the evidence here "raise[s] a triable issue of material fact regarding whether Sheriff [Glanz] was aware of dangerous prison conditions that were substantially likely to result in constitutionally deficient medical care for seriously ill

---

[22]  Where *Layton* first cited *Tafoya*, the court stated in a footnote that "the question that must be answered in the individual liability analysis is essentially the same as the one that must be answered at the first step of the municipal liability inquiry: whether an individual officer committed a constitutional violation. As such, *Tafoya* provides a useful guide for analyzing cases in which the failure to remedy ongoing constitutional violations, or circumstances that are likely to lead to such violations, causes harm to a particular detainee."  512 F. App'x  at 869, n.6.

detainees" and "a reasonable jury also could infer that Mr. [Williams's] death was, in fact, caused by these dangerous conditions." *See* 512 F. App'x at 870. Indeed, Glanz had been notified in writing that a federal agency had recently found a prevailing attitude of indifference among the Jail's staff in the clinic, that nurses were undertrained and not properly evaluating patients, that detainees with clear medical problems had not been seen by a doctor, and that one inmate suffered a perforated appendix because of a clear lack of training and supervision, yet Glanz failed to timely take action to abate those serious problems. (Doc. 263-3 at ¶ 1). And there is evidence that the un-remedied clinic staff indifference to Mr. Williams's serious medical needs caused his death.

As noted generally, *supra*, in analyzing the second prong of the qualified immunity analysis, the Court must ask "whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan*, 134 S. Ct. at 1866. Here, defined very specifically (which, as noted above at pp. 30-31, it need not be), the question could be framed as follows, construing the record evidence in favor of the plaintiff in this case: As of October 2011 when Mr. Williams died, was the law clearly established that a jail supervisor violates the constitutional rights of an inmate who suffers and dies at the jail as a result of a denial of medical care for an obviously serious medical need, where the jail supervisor (1) was responsible for intentionally maintaining a policy of providing deficient medical care that he knew placed inmates with serious medical needs at substantial risk of harm, (2) advertently ignored prior auditors' reports that the Jail's medical system and staffing suffered from a prevailing attitude of indifference, that medical staff were undertrained and unsupervised and were not properly evaluating inmates' medical needs, that inmates were not being timely seen or evaluated by a doctor, and that inmates had suffered serious medical

consequences as a result of those issues, and (3) took no action to timely abate those known, substantial risks of serious harm to inmates?

The answer to that question is "yes," based upon pre-2011 authorities, which clearly (1) defined an inmate's rights to medical care and (2) identified established methods of proving supervisory liability. (*See* authorities and discussion of the law emanating from *Estelle* and the law identifying bases for supervisory liability as set forth in *Dodds*, at pp. 29-32, 44, *supra*). Specifically, *the law was clearly established* before Mr. Williams's death that a jail official like Mr. Glanz could be held liable for violating a pretrial detainee's constitutional rights under the Fourteenth Amendment, applying Eighth Amendment standards, under the circumstances described above. *See Estelle*, 429 U.S. at 104-05 (prison officials who intentionally deny or delay inmate access to medical care violate the Eighth Amendment); *Ramos*, 639 F.2d at 575 ("Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment"); *Mata*, 427 F.3d at 751 (delay in medical care would violate the Eighth Amendment where the delay causes the inmate substantial harm); *Dodds*, 614 F.3d at 1199 (identifying bases for supervisory liability); *Gonzales v. Martinez*, 403 F.3d 1179, 1183 (10th Cir. 2005) ("an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm *actually* would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge* of a substantial risk of harm") (quoting *Farmer*, 511 U.S. at 842).

Although the Court has found no case involving identical facts as of 2011, the unlawfulness of denying an inmate medical care was "apparent" under preexisting law, and qualified immunity is thus inappropriate as to Glanz. *See Booker*, 745 F.3d at 433-34 ("As long

as the unlawfulness of [the challenged conduct] was 'apparent' in light of pre-existing law,' then qualified immunity is inappropriate") (quoting *Hope*, 536 U.S. at 739).  In *Booker*, the Tenth Circuit rejected defendants' argument that "preexisting authority did not give them adequate notice that they could be deliberately indifferent by failing to summon medical care within a three-minute period" and noted that "[t]he law can be clearly established even when 'the very action in question' has not 'previously been held unlawful.'"  *Id.*

Mr. Glanz's summary judgment motion is **denied**.

## C.      Official Capacity / *Monell* Claim

The Court previously substituted the current Sheriff, Vic Regalado, for Mr. Glanz on the official capacity claim.  (Doc. 302).  A claim against a government actor in his official capacity "is essentially another way of pleading an action against the county or municipality" he represents, and is considered under the standards applicable to 42 U.S.C. § 1983 claims against municipalities or counties.  *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Lopez*, 172 F.3d at 762 ("[Plaintiff]'s suit against Sheriff LeMaster in his official capacity as sheriff is the equivalent of a suit against Jackson County, [Oklahoma].").

To hold a county liable under § 1983, a plaintiff must demonstrate (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation").  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc.*

51

*Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

The Tenth Circuit has described several types of actions which may constitute a municipal policy or custom:

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson*, 627 F.3d at 788 (citations omitted).

With respect to a failure to train or supervise, a municipality may be liable where "the need for more or different training is so obvious, and the inadequacy [in training] so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. In *Canton*, the plaintiff was arrested and officers brought her to the police station in a patrol wagon. *Id.* at 381. Upon arrival, she made incoherent remarks and slumped to the floor. She was released an hour later, and her family had her taken by ambulance to a nearby hospital, where she was diagnosed with severe emotional ailments. *Id.* Plaintiff brought a § 1983 claim, alleging that the officers – who failed to summon medical care for her during the time she was at the police station – had been inadequately trained to make a determination as to when to summon medical care. *Id.* at 381-82. The Supreme Court held that, even where a municipality has a policy to provide medical care that is facially constitutional, a claim may be based upon a failure to train where the failure reflects deliberate indifference by the municipality. *Id.* at 387-92.

Plaintiff has presented sufficient evidence to demonstrate the existence of a fact issue preventing summary judgment on the official capacity *Monell* claim.   Based on the record evidence, construed in plaintiff's favor at this stage, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, Tulsa County had a policy or custom of failing to provide medical care in response to serious medical needs of Jail inmates, failing to provide Jail staff with proper training and supervision regarding inmate medical needs, and continuing to adhere to a constitutionally deficient system of care for detainees with serious medical needs. There was prior notice to the former Sheriff and other Jail supervisory officials that the Jail's deficient medical care system placed inmates like Mr. Williams at serious risk of substantial harm.   For example, those officials were notified of the CRCL's findings: of "a prevailing attitude among [Jail] clinic staff of indifference" (Doc. 263-3 at ¶ 1); that nurses were "undertrained [and are] not documenting or evaluating patients properly" (*id.* at ¶ 7); that such "clearly demonstrated lack of training" "and supervision" had resulted in an inmate suffering a perforated appendix (*id.*); and that inmates were not timely being seen by or provided access to Jail doctors (*id.* at ¶ 8).

There is also evidence that former Sheriff Glanz and other TCSO officials were notified of numerous, serious deficiencies in the 2010 NCCHC audit, but took no action to abate the resulting risks posed to Jail inmates.   (*See* Doc. 263-48 at 0075-0086).   A jury could also infer from the evidence that Glanz and Albin were aware that the Jail's system of medical care was so deficient that certain inmate medical records would need to be concealed from auditors in order for the Jail to pass the NCCHC audits.

From the evidence in the record, a reasonable jury could conclude that the former Sheriff was on notice of constitutional deficiencies in the care of inmates with serious medical needs and

that his failure to take appropriate measures to remedy these deficiencies constituted deliberate indifference, and thus the County may be liable on the basis that the actions of the sheriff, as the final policymaker with regard to the Jail, "may fairly be said to be those of the municipality." *Lopez*, 172 F.3d at 763; *see also Layton*, 512 F. App'x at 871-72 (internal citations omitted) ("The County may also 'be liable on the basis that Sheriff Whetsel is a final policymaker with regard to its jail, such that his actions 'may fairly be said to be those of the municipality.' . . . Here, a reasonable jury could conclude that Sheriff Whetsel was on notice of constitutional deficiencies in the care of seriously ill detainees, and that his failure to take appropriate measures to remedy these deficiencies constituted deliberate indifference.").

The evidence also supports a reasonable finding that, despite notice of the serious risks of substantial harm posed to inmates by the constitutional deficiencies in the Jail's care of seriously ill inmates, no action was taken to abate those risks. Such evidence supports a finding of municipal liability. *See Barney*, 143 F.3d at 1307 (deliberate indifference may be satisfied where a county "has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."); *see also Layton*, 512 F. App'x at 871.

The record also supports a finding that the foregoing practices were the "moving force" behind the violations of Mr. Williams's constitutional rights. *Brown*, 520 U.S. at 404. The plaintiff has presented sufficient evidence to show a "direct causal link" between the County's policies and the deprivation of Mr. Williams's constitutional right to receive medical care. As noted with respect to the claim against Mr. Glanz, a reasonable jury could find that, had Mr. Williams received medical care for his injuries during the several days he lay seriously injured in the Jail, he would have lived. The jury could also find that the County, via the former Sheriff

and other TCSO officials, was on notice as to the problems with the Jail's medical care system and, had they taken any timely remedial steps to abate the resulting risks, Mr. Williams's condition would not have deteriorated and his death would have been avoided. *See Layton*, 512 F. App'x at 871-72.

In summary, plaintiff has presented evidence of disputed material facts presenting a genuine issue as to whether Tulsa County was, through its policies, deliberately indifferent to conditions at the Jail so as to violate Mr. Williams's constitutional rights and whether the County's policies were the moving force behind the constitutional violation and Mr. Williams's death.  These genuine issues of material fact preclude summary judgment on the plaintiff's *Monell* claims, and the summary judgment motion is hence **denied** as to the official capacity claim against Sheriff Regalado.

## VI.    Conclusion

The motions of OPD Officers H.D. Pitt, Tracy Townsend, Lem Mutii, and Jack Wells (Doc. 219, 220, 221, and 222) are hereby **granted**, and the motion for summary judgment on the individual liability claim against Stanley Glanz and the official capacity claim against Vic Regalado (Doc. 224) is **denied**.

SO ORDERED this 20th day of July, 2016.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE